Karen HIXENBAUGH et al., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. C79–692.

United States District Court, N. D. Ohio, E. D.

Sept. 16, 1980.

---

462

Michael Shafran, Bruner & Shafran, Cleveland, Ohio, for plaintiff.

Patrick M. McLaughlin, Dennis P. Zapka, Asst. U. S. Attys., Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

This is an action initiated by the plaintiff Karen Hixenbaugh (Hixenbaugh) pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, and the National Swine Flue Immunization Program Act, 42 U.S.C. § 247b wherein plaintiff seeks compensatory and punitive damages for permanent injuries assertedly resulting from an acute polyradiculoneuropathy identified in this action as Guillain Barre Syndrome (GBS) proximately caused by the alleged negligence and breach of express and implied warranty of the United States in the administration of a swine flu inoculation on or about October 24, 1976.

Plaintiff's husband Robert Hixenbaugh joins in the action seeking damages for the loss of affection, companionship, services and consortium of his wife.

The jurisdiction of the Court is properly invoked. The Complaint herein was filed on June 23, 1979. Pursuant to 28 U.S.C. § 1407, the action was transferred by the Judicial Panel on Multi-District Litigation to the United States District Court for the District of Columbia for consolidated and coordinated pretrial proceedings. Subse-

quent to a final pretrial Order issued by the transferee court, *In Re Swine Flu Immunization Products Liability Litigation*, Misc. No. 78–0040 (D.D.C. November 15, 1979), the within cause was remanded to this Court for final disposition upon stipulations and evidence adduced at trial.

It is conceded by the Government that Hixenbaugh received a monovalent Swine Flu vaccination on October 24, 1976 at the Randall Park Mall in North Randall, Ohio which was administered by the Government as a part of the National Influenza Immunization Program undertaken in 1976. She experienced an immediate painful reaction in her arm in the area of the innoculation which subsided by the following morning. Approximately three weeks after receiving the innoculation, Hixenbaugh developed stomach pains, diarrhea and nausea, which symptomology was alleviated by medication prescribed by Dr. Charles G. Zegiob, M.D., on November 24, 1976. In January of 1977 plaintiff contracted influenza, and the condition ran its course and she recovered without complications.

During the intervening months Hixenbaugh displayed no symptomology and enjoyed excellent physical health. On Sunday, January 22, 1978 she manifested generalized pain and muscle twitching in the calves and thighs of both legs. The muscular "flicking" accompanied by increased pain continued until January 25, 1978 when she was admitted to Marymount Hospital with a slight fever.

Dr. Cornelio B. Deogracias, M.D. (Deogracias), her treating physician in his admission notes recorded:

Painful calves for three days which started while house cleaning. Calve pain aggravated by walking. No related trauma to the legs. Has cold. Eyes, ears and throat negative. Heart and lungs normal. No swelling of legs. Mild viscosities of the right thigh and leg ...

Bilateral calve tenderness, Homan's sign suggestively positive.

Plaintiff's temperature was recorded as 100.2 degrees orally. The doctor's impression was possible thrombophlebitis right and left lower legs. (Tr. pgs. 226–27)

Deogracias engaged in consultation with doctors Edward M. Zucker, M.D. (Zucker), a neurologist, and Edward W. Shannon, M.D. (Shannon), a neurological surgeon. A diagnostic venogram ruled out the initial diagnosis of thrombophlebitis and plaintiff, within a short period of time, developed a bilateral "foot drop". Shannon's consultation notes disclosed:

The examination at this time revealed the patient to be a friendly, pleasant, well-developed 28-year-old white female with unsustained nystagmus on lateral gaze in both directions. There was questionable temporal pallor of both optic discs. The tendon reflexes were moderately hyperactive, moreso in the lower extremities than in the upper. The Babinski responses were absent. There was no evidence of any sensory disturbance. She had a severe bilateral foot drop ....

This patient may have a Guillain-Barre syndrome or this may be an acute onset of multiple sclerosis.

Shannon performed a lumbar puncture. Subsequently, the spinal fluid was reported as being negative. More specifically, the fluid was clear and colorless. Sugar level was 65 mg. per cc. The total protein was 21 mg. per cc.

Zucker's diagnosis of the patient's disorder was a peripheral neuropathy ... "of which I did not know the etiology. I really didn't have any evidence to say what the cause of it was." Zucker also recorded that his neurological examination of the plaintiff disclosed that the cranial nerves were normal; that the reflexes in her arms were active and equal. An inconsistency in his notes states "... the Achilles reflexes were active and equal ... ankle reflexes were absent." The Doctor explained the inconsistency from recollection and stated that the Achilles reflexes were absent the first time he examined the plaintiff. (Zucker appears to contradict his recollection concerning the absence of Achilles reflexes and the significance of such clinical findings between pages 85 and 99 of the transcript

of testimony.) He found no sensory impairment, but noted some weakness in the patient's legs and the bilateral foot drop, together with some weakness of her hands.

Subsequent to the plaintiff's discharge from the hospital on February 7, 1978, her physical condition continued to deteriorate to a point where she could not raise her legs. She developed "wrist drop" and was unable to extend her fingers. Approximately seven to eight weeks from the onset of the neurological symptoms she reached a plateau after which her condition began to slowly improve with the aid of physiotherapy. During the ensuing eleven months she regained the full and complete use of her arms, hands and fingers, which prompted Zucker, on September 14, 1979, to report:

> She (Hixenbaugh) still has weakness of both legs and especially of dorsiflexion. There is no sensory loss and little muscle atrophy. She is confined to a wheel chair but walks with crutches at home. She does much of her household duties. Neurologic exam—
>
> ... reflexes in arms 2+ equal reflexes in legs ... 3 equal reflexes in ankle jerks 1+ equal Babinski—withdrawal bilaterally.

(Government Exhibit G)

On March 17, 1980, Hixenbaugh was admitted to Highland View Hospital for programed physical therapy at which time she was examined by Dr. Asikin Mentari, M.D. (Mentari), a specialist in physical medicine and rehabilitation and Dr. Yun Jen Sheen, M.D. (Sheen), a resident in physical medicine and rehabilitation. At that time a neurologic examination disclosed active tendon reflexes and an "upgoing" or positive Babinski sign bilaterally. Mentari's impression of the plaintiff's neurological disorder resulting from the examination was a "chronic, generalized motor neuropathy of the lower extremities with the distal muscles affected more than the proximal". (Tr. p. 268) Sheen noted "that GBS should be ruled out". (Gov't Ex. P) Dr. Winkelman, a neurologist, upon examination of the plaintiff "found evidence of a central nervous system lesion with spasticity, increased reflexes, and up-going plantar responses." *Id.*

The initial issues joined by the pleadings, testimony and exhibits presented for resolution by the Court are twofold, namely:

1. Identification of the plaintiff's neurological disorder; and

2. The causal relationship, if any, between said disorder and the innoculation of monovalent Swine Flu Vaccine administered by the Government as a part of its National Influenza Immunization program to the plaintiff Hixenbaugh on October 24, 1976.

Guillain Barre syndrome is an inflammatory neurologic disorder of unknown etiology which affects the peripheral, as opposed to the central nervous system. The syndrome is characterized by neurologic symptoms rather than a specific organic disorder. The National Institute of Neurological Communicative Disorders and Strokes (NINCDS) has defined the clinical, laboratory and electrodiagnostic criteria for diagnosis of GBS. As stipulated by the parties, features required for the diagnosis under the NINCDS criteria are a progressive motor weakness of more than one limb, and areflexia (loss of tendon jerks). Variants indicative of a different disease process include fever at the onset of neuritic symptoms, severe sensory loss with pain, progression of the disease beyond four weeks, cessation of progression without recovery or with major permanent residual deficit remaining, and central nervous system involvement. Elevated cerebrospinal fluid protein is "strongly supportive" of the GBS diagnosis.

Although the exact etiology of GBS is unknown, it has been associated with a variety of antecedent events most common of which is a viral infection either respiratory or gastroenteric. Other antecedent events temporally associated with the onset of GBS include bacterial infections, malignant diseases, vaccines and surgery.

The interval between the prodromal infectious episode and the ensuing symptomology is a variable. The infectious symp-

tomology has usually subsided by the time the neuropathic manifestations surface. To date, no biochemical procedure has evolved capable of isolating the organic cause, if any, of GBS. Accordingly, causal connection can be established only from reported clinical observations and studies and the inferences drawn therefrom. Recorded elevated protein levels in the cerebrospinal fluid, progressing from accepted norms during the initial few days of the onset of the clinical findings with peaking within four to six weeks provide critical laboratory support for the more common clinical diagnostic procedures. Electromyography which measures the rate of nerve impulse conduction is also a valuable diagnostic procedure utilized to recognize the syndrome.

In considering the nature of Hixenbaugh's neurological disorder, the Court is reminded that GBS is a neuritis of unknown etiology that affects peripheral, as opposed to the central nervous system. A review of Shannon's testimony discloses that plaintiff's neurological consultant conceded:

Q. And would you describe for the Court your perception, your understanding, of Guillain-Barre syndrome?

A. Yes; Guillain-Barre syndrome is a neurological disorder described by two French physicians, hence the name. It is known as a peripheral neuritis. It affects peripheral nerves and results in motor weakness, chiefly . . .

It is called a polyneuritis, is another name for it. It is characterized by, as time goes by, there is an elevation of the cerebral spinal fluid protein.

And, also, the weakness is ascending and may ascend up and produce respiratory difficulty. It may even progress upward and result in difficulty in swallowing.

Q. And, Doctor, does Guillain-Barre syndrome sometimes involve the central nervous system?

A. No, it is not supposed to.

Q. Doctor, now, would you explain the mechanism, the process, that causes or creates Guillain-Barre syndrome?

A. Well, it has been known as a disease of unknown etiology. There are certainly predisposing factors that we see. Not infrequently the patients will give a history of having had flue or some viral infection prior to the onset of their symptoms.

Q. And what physically takes place inside the body that produces the peripheral neuropathy referred to as Guillain-Barre syndrome?

A. I really don't know.

Q. Do you understand Guillain-Barre syndrome to involve the myelin sheaths of the nerves?

A. Yes, I believe it does.

Q. And what occurs with reference to the myelin of persons afflicted with Guillain-Barre syndrome?

A. Well, there is a slowing down of the conduction of impulses, and the motor power is weakened, that is, that patients become unable to move. There may be partial paralysis or complete paralysis.

Q. And can this process, destruction of the myelin, involve the total nervous system?

A. The total nervous system?

Q. That's correct.

A. So far as I know, it does not.

(Shannon direct testimony pp. 163–165)

Zucker, plaintiff's second neurological consultant, advanced a final diagnosis on February 7, 1978, "that Mrs. Hixenbaugh was suffering from a peripheral neuropathy of undetermined etiology".

On cross-examination, Zucker testified:

Q. The fact is, Doctor, that at the time you diagnosed Mrs. Hixenbaugh's condition as Guillain-Barre syndrome you did so under the erroneous assumption that she had received a swine flu shot in December of 1977; isn't that correct?

A. That's correct.

Q. I believe your testimony is, as well, Doctor, that you did not diagnose Mrs. Hixenbaugh's condition until January of 1977—I'm sorry, in January of 1979, after you had been informed that she had received a swine flu vaccination?

A. That's correct.

Q. And you received that information when you received a letter from Mr. Shafran; is that correct?

A. Yes.

Q. Doctor, do you recall reading some of the adverse publicity which followed the swine flu innoculation program in late 1976 and early 1977?

A. I did.

Q. Do you recall that there was a great deal of adverse publicity, wasn't there?

A. There was some.

Q. And that adverse publicity, as you recall, linked the swine flu vaccinations with Guillain-Barre syndrome; is that correct?

A. That's correct.

Q. In light of that, Doctor, isn't it true that upon learning in January of 1979 that Mrs. Hixenbaugh had received the swine flu vaccination, and in light of the adverse publicity of which you were familiar, you suspected that the swine flu shot may have precipitated what you believed to have been Guillain-Barre syndrome; isn't that correct?

A. That's correct.
(Zucker cross examination p. 112–113).

Q. But during that period of time you always received a knee jerk reflex, didn't you?

A. Right.

Q. And here you got a moderately hyperactive knee jerk and a hypoactive ankle jerk for the first time in your notes?

A. Hypoactive, yes.

Q. That's correct.

Q. Aren't these reflex findings suggestive, Dr. Zucker, of an upper motor neuron disorder?

A. It is possible. Possible.

Q. They are inconsistent with a diagnosis of a lower motor neuron disorder, aren't they?

A. If the lower motor neuron lesion was improving, it would not be inconsistent.

Q. Well, if you found the improvement in the reflexes, Doctor, wouldn't you find the improvement as well in the motor weakness?

A. You could, yes.

Q. Isn't it a fact that most likely you would?

A. Most likely, I think so.

Q. Doctor, you indicated that you had the opportunity to review Dr. Winkelman's neurological examination of Mrs. Hixenbaugh which was performed at Highland View Hospital; is that correct?

A. I did see it, yes.

Q. And do you recall the date of that was sometime in March of 1980?

A. I don't know the definite date. I don't have a copy of that. Is it in the book here?

Q. I can certainly refer you to it, Doctor.
Let me refer you to what has been marked for purposes of identification as Government's Exhibit P.

A. E?

Q. Yes, P as in Paul, P–22 and 22–A.

A. I have it.

Q. This is a consultant's note, is it not, from Cuyahoga County Hospital, Doctor, which is Highland View?

A. Right.

Q. And do you see the date of 3–19–80 reflected on this document?
I am on page 22.
Making sure we have the same document, do you see Dr. Winkelman's

name written at the bottom under "Consultant's signature"? That would be P–22, Dr. Zucker.

A. I have P—oh, 22?

Q. P–22, right. The numbers will be found—

A. Yes, I have it.

Q. And that is Dr. Winkelman's consultant note?

A. Right.

Q. Which you had the opportunity to review?

On page 22–A do you see the little diagram of the person, the character sketched in there on 22–A?

It is the second half of Dr. Winkelman's neurological exam.

THE COURT: It is up in the right-hand quarter of the page, Doctor.

THE WITNESS: A quarter of the way down?

THE COURT: No, right there where your finger was.

A. Oh, here, where there is a diagram of the—?

Q. Yes. I don't know what neurologists would call that. What is that character referred to as?

A. It is a diagram of the locations of the tendon reflexes and the Babinski sign.

Q. Doctor, let me see if I can labor through this with your assistance, please.

I think it indicates that the upper tendon reflexes were 3?

A. Hyperactive, right..

Q. And that is hyperactive?

And it indicates that the lower tendon reflexes are at 4, which is hyperactive, isn't it?

A. Yes.

Q. And do the arrows at the feet indicate a positive Babinski?

A. Right.

Q. Isn't it true, Doctor, that these findings are inconsistent with a diagnosis of a lower motor neuron disease, these clinical findings?

A. I think these findings as indicated here would be an upper motor neuron disease, right.

Q. That is correct.

So you would consider these findings to be important diagnostic features which must be considered in reaching a diagnosis of Mrs. Hixenbaugh's present condition; is that correct?

A. Obviously it has changed over a period of time.

Q. And, Doctor, if I told you that—and I ask you to assume what I tell you to be true. If I told you that on June 11th, 1980, a neurologist, Dr. Monroe Cole, performed a neurological examination of Mrs. Hixenbaugh and among his findings were lower extremity reflex actions of 3 plus plus, both of the knee jerk and the ankle jerk, as well as the positive Babinski and other signs, would those facts be important for you to know in reaching a diagnosis of Mrs. Hixenbaugh's condition?

A. As this Dr. Winkelman's examination would indicate, an upper motor neuron lesion, right.

Q. As a matter of fact, those features which I just described to you support what Dr. Winkelman said; isn't that correct?

A. Yes.

Q. And do in fact point to an upper motor neuron disorder as opposed to a lower motor neuron disorder?

A. Right.

(Zucker cross examination pp. 117 thru 121)

Shannon testified further on cross-examination:

Q. Assume that on September 14th, 1979, Mrs. Hixenbaugh was examined by Dr. Zucker; neurological exam at that time showed that the reflexes in the upper extremities were two plus and equal, that the knee jerk reflexes were three plus and equal, and that the ankle jerk reflexes were one plus and equal.

Assume furthermore, sir, that on March 19th, 1980, Mrs. Hixenbaugh was again examined by a neurologist, this time at Highland View Hospital, and at that time the neurologist determined that Mrs. Hixenbaugh's upper extremity reflexes were three, the lower extremity reflexes were four, including the knee jerk and the ankle jerk, and that the Babinski was positive.

Assume furthermore, Dr. Shannon, that on June 11th, 1980, Mrs. Hixenbaugh was examined by Dr. Monroe Cole, a neurologist, who found among other things that Mrs. Hixenbaugh's lower extremity reflexes, both the knee jerk and the ankle jerk, were three plus plus, with the positive Babinski sign.

Knowing those facts and assuming those facts as true, would you consider them to be important in reaching a diagnosis of Mrs. Hixenbaugh's condition?

A. Yes, I would.

Q. In light of the facts and data which you have testified about today, and in light of those facts which I have just described to you, would that change the opinion that you gave ..., had you known those facts?

A. It would be most unusual to have increased tendon reflexes and positive Babinski response.

Q. Isn't it true, Doctor, that the symptoms or the features that I just described to you are symptomatic of an upper motor neuron disorder rather than a lower motor neuron disorder?

A. Yes, sir.

Q. And your testimony is, I believe, that Guillain-Barre syndrome is a lower motor neuron disorder; is that correct?

A. Yes, that is correct.

Q. Let me ask you, Doctor, whether or not you know if multiple sclerosis, for instance, is an upper motor neuron disorder?

A. Yes, it is. It is an upper motor neuron disorder.

Q. Doctor, let me ask you to assume a few other facts to be true as well.

Assume that on June 11th, 1980, Dr. Cole found the following to be true: That there was an unsustained horizontal nystagmus on left lateral gaze; that there was a moderate spasticity of the right lower extremity and there was a slightly greater spacticity of the left lower extremity; that there was unsustained ankle conus bilaterally, and a few beats of patellar conus on the right lower extremity; and, again, as I indicated, the plantar responses were both definitely and majestically extensor.

Sir, would those facts be important to you in arriving at a diagnosis of Mrs. Hixenbaugh's condition?

A. Yes, they would.

Q. And assuming all those facts to be true, how would they affect, sir, the decision which you gave in your testimony today?

A. Well, they would indicate to me, if present, that there was an upper neuron lesion.

Q. And wouldn't that rule out Guillain-Barre syndrome?

A. Yes, it would.

(Shannon, cross-examination, pp. 207–212)

On June 11, 1980, Hixenbaugh was examined by Dr. Monroe Cole, M.D. (Cole), a neurologist, who found a positive Babinski sign, hyperactive reflexes in the lower extremities, and sustained horizontal nystagmus of the eyes. In a letter dated June 11, 1980, he concluded, in pertinent part:

In summary, examination reveals proximal and distal symmetrical weakness in the lower extremities with moderate spasticity, clonus and bilateral extensor plantar responses indicative of a central nervous system lesion above the lumbar spinal segments. There is no concomitant sensory deficit. The history of the illness suggests a lesion at the level of the lower cervical spinal cord.

In my opinion a myelitis of the lower cervical spinal cord is the most likely di-

agnosis. The presence of nystagmus at the present time raises the possibility that the myelitis is part of a more widespread demyelinating disease, i. e. multiple sclerosis. Mrs. Hixenbaugh is permanently disabled from her neurological disease but it would be neurologically inconceivable that the Landry-Guillain-Barre syndrome is the neurological illness which is causing her present disability. (Government Exhibit Q).

■ Upon consideration of the instant record in its entirety, the Court is constrained to conclude that plaintiff has not demonstrated, by a preponderance of the evidence, that her neurologic disorder results from GBS. The Court notes, in particular, that Hixenbaugh experienced a fever at the onset of her symptoms, the disease became more aggravated over a period of seven to eight weeks, cerebrospinal fluid protein was not elevated, and her neurologic affliction assumed permanent characteristics. Applying the criteria noted hereinabove militates against a diagnosis of GBS. Especially crucial, moreover, are the indications throughout Hixenbaugh's medical history subsequent to January 22, 1978, that her disorder prominently involved the central nervous system. This was evidenced by hyperactive tendon reflexes and a positive Babinski sign, repeatedly noted by her examining physicians.

■ Assuming, *arguendo*, the validity of plaintiff's allegation that her permanent injuries result from GBS, Hixenbaugh has failed to establish, by a preponderance of the evidence, a direct or proximate cause between the GBS and the inoculation administered by the Government on October 24, 1976. It is axiomatic that the plaintiff must demonstrate that the product in issue was the direct and proximate cause of the injury sustained. *See, e. g., Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352 (6th Cir. 1978); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977); *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.2d 227, 218 N.E.2d 158 (1966). Moreover, it is fundamental that the plaintiff must prove each material fact in controversy necessary to his or her right to recovery by a preponderance of the evidence, and a judgment for the plaintiff cannot be founded upon mere speculation. *See Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341 (9 Cir. 1978); *Wolf v. Reynolds Electrical & Engineering Co.*, 304 F.2d 646 (9 Cir. 1962); *American Casualty Co. v. Myrick*, 304 F.2d 179 (5 Cir. 1962); *Michalec v. Hutchison*, 123 Ohio St. 494, 176 N.E. 79 (1931); 21 O.Jur.2d Evidence, § 696.

As noted, GBS is an inflammatory neurologic disorder of unknown etiology for which no biochemical procedure has evolved to date capable of isolating its organic cause.

Consequently, causal connection can be established only from reported clinical observations and the inferences drawn therefrom.

Implementation of the National Influenza Program of 1976 incorporated a nationwide surveillance program coordinated by the Center of Disease Control in Atlanta, Georgia (CDC) designed to evaluate swine flu vaccine reaction. Results of the surveillance disclosed that other than GBS, no illnesses, including deaths, were reported in excess of levels expected for the general population. Thus, with the exception of GBS and rare cases of anaphylaxis, an immediate adverse immunological reaction, "no other serious illnesses were associated with influenza vaccination". Retailliau, et al., *Nationwide Influenza Vaccine Reaction Surveillance 1976–1977* (Government Exhibit M).

The medically significant and highly respected epidemiologic evaluation of Dr. Lawrence B. Schonberger, M.D. (Schonberger), reported in the 110 *Am. J. Epidemiology*, 105 (1979) styled *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–77*, perhaps the most extensive study undertaken to determine the incidence of GBS, concluded that there was an etiologic relationship between the swine flu vaccine and GBS but the relationship extended, at most, for ten weeks. (*Id.* at 112, figures 6 & 7) Schonberger's conclusions

were predicated upon an analysis of data received by the CDC through March 1978 on cases of GBS with onset between October 1, 1976 and January 31, 1977. Of the 1098 reported GBS cases analyzed; 532 had received the swine flu vaccination prior to the onset of the symptoms. The number of reported cases rose sharply between mid October and mid December, peaking the week ending December 18, 1976. Thereafter, a dramatic drop-off in reported cases was recorded.[1] The reported number of unvaccinated cases of GBS during the weeks from October 1 to December 18 were relatively stable with a noticeable drop-off in reported cases after December 18, 1976. *Id.* at 109. The epidemiological study also disclosed that by early December of 1976, the weekly attack rates [2] on the vaccinated population decreased noticeably returning to approximately the level of unvaccinated population by late January, 1977.

Plaintiff questions the relevancy of the Schonberger study, and argues that it was not designed nor intended to determine any period within which a causal connection between the innoculation and the onset of symptomology could exist but rather its purpose was to verify a causal relationship, if any, between vaccination and the syndrome. Plaintiff urges that the only individuals in the survey who could have contracted GBS more than ten weeks after innoculation were those receiving the vaccine prior to November 15, 1976, thereby invalidating the statistical basis of the survey.

Hixenbaugh's initial argument is defeated by the validated available information incorporated into the survey including the dates of innoculation and the onset of symptomology as well as medical histories of the patients. Plaintiff's second argument is equally unpersuasive, as the disclosures of Government Exhibit L reflect that over twenty million individuals received the vaccine between October 1 and November 15, 1976 (including the plaintiff herein).

Although the Court has considered with interest plaintiff's "delayed hypersensitivity reaction" theory, hypothesized by Dr. Joseph Bellanti, M.D. (Bellanti) a noted immunologist, and supported by Zucker and Dr. Richard C. Graham, M.D. (Graham) another credible immunologist, the Court finds the "delayed hypersensitivity reaction" theory unconvincing and highly speculative, especially when viewed within the context of the evidence.[3]

Both Zucker and Graham in testifying to a causal relationship between Hixenbaugh's neurologic disorder and the swine flu innoculation of October 24, 1976, elected to predicate their express opinions upon something less than a reasonable degree of medical certainty. For instance, Zucker utilized terminology such as "may have contributed" (Zucker direct testimony, p. 63), and Graham opined that a secondary anamnestic response "could have occurred" (Graham direct testimony p. 353). Graham noted that the immunological cross-reaction mechanism is "not known for sure," and is only a "possibility", and when pressed further on cross-examination reluctantly conceded that he was unable to state to a reasonable degree of medical certainty that Hixenbaugh's neurological disorder was causally related to her swine flue innoculation:

> Q. Doctor, based upon your review of Dr. Bellanti's deposition ... and based upon your review of the hospital records of Mrs. Hixenbaugh, you are not able at this time, are you,

---

1. The National Influenza Immunization Program was discontinued on December 16, 1976.

2. The attack rate represents a fraction with a numerator representing the cases of GBS in the entire population and a denominator representing the entire population.

3. In his deposition, Plaintiff's Exhibit 60, Bellanti testified that a delayed, cross-reactive auto-immunity may occur many months subsequent to vaccination. He hypothesized further that the vaccine antigens conferring protection against disease stimulate the protection of immunizing antibodies which may cross-react adversely with the bodies of tissue thereby sensitizing the immunological system to subsequent exposure to the antigen by way of viral infection which may cause a more severe cross-reactive auto-immunity resulting in damage to the peripheral nervous system.

Doctor, to say, to a reasonable degree of medical certainty, that the neurological illness of Mrs. Hixenbaugh which was manifested by the onset of symptoms in January of 1978 is causally related to the receipt of the swine flu shot on October 24th, 1976; isn't that correct?

A. May I have a point of clarification? Are you referring to probable cause?

Q. Doctor, I am asking you whether or not—

THE COURT: Yes, probable cause, causal relationship.

A. I am not able to say that.

Q. You are not able to say that to a degree of medical certainty?

A. That is true.

Q. And isn't it true, also, Doctor, that you are not at this time, based upon that same information, capable of stating to a reasonable degree of medical probability that there is a causal relationship between the receipt of the swine flu shot on October 24th, 1976, and the onset of neurological symptoms in January of 1978?

A. That is true.

Q. The best you can say, based upon the information you have available, Doctor, is that this theory of hypersensitivity, as it has been described, is plausible; isn't that correct?

A. That is true.

Q. And isn't it your opinion, Doctor— well, the sum and substance of your opinion, Doctor, is that there just is not sufficient evidence to either disprove or, for that fact, prove the hypersensitization theory as set forth by Dr. Bellanti?

A. That is true.

(Graham, cross-examination, pp. 378–380).

The Court further notes that Ballanti's hypothesis has been considered in detail by Dr. Randall S. Krakauer, M.D. (Krakauer), an expert in autoimmune disease who testified at trial. In a letter dated June 23, 1980, he states, in pertinent part:

. . . Very little of the [Balanti] transcript and none of the literature is relevant to this case since the autoimmune schemes proposed, some of which are supported by experimental evidence, apply only to reactions occurring shortly (within weeks) after immunization. A very small portion of the transcript is devoted to speculation concerning a hypothetical mechanism whereby adverse immunologic reactions can occur much later (years). This is very highly speculative, which Doctor Ballanti admits to, and the tone of the transcript in my opinion assigns this a higher probability than it deserves. Specifically, none of the basic research, statistical monitoring or case reports in this area provide any support for this hypothesis, and in particular, none of the literature cited in the testimony. Indeed, cross-reactive antigenic properties between swine flu and neuronal tissue are conspicuously lacking and the only disease associated with swine flu immunization has been Guillain-Barre syndrome and this association does not persist more than eight or perhaps ten weeks beyond immunization. There therefore appears to be considerable scientific evidence suggesting that this proposed scheme does not play a significant role in producing long-delayed disease as a result of such immunization. From a scientific point of view, though the scheme proposed cannot be rigidly discarded, lack of any scientific supporting evidence and presence of not inconsiderable conflicting evidence would not warrant its acceptance as even a theory.

(Government Exhibit S).

The Court finds that Krakauer's characterization of Ballanti's hypothesis is accurate, and Ballanti himself has indicated that the immunological phenemenon he describes is "speculation". (See Ballanti deposition, Plaintiff Exhibit 60, pp. 28, 30). Plaintiff has not presented any other credible and persuasive evidence of a causal connection between Hixenbaugh's swine flu shot and her neurological disorder.

Liability in the instant case cannot be predicated upon speculation or mere possibility, and the Court concludes that plaintiff has failed to demonstrate that Hixenbaugh's swine flu shot of October 24, 1976

was the proximate cause of her neurological disorder which commenced some fifteen months later on January 22, 1980.

In view of the foregoing, the Court concludes that it is unnecessary to further adjudicate other issues relating to the negligence, breach of warranty or strict liability on the part of the United States, if any existed.

Accordingly, for all the reasons stated hereinabove, judgment is hereby entered in favor of defendant.

IT IS SO ORDERED.