**Reba Inez PARHAM**

v.

**UNITED STATES of America.**

Civ. No. 3–79–19.

United States District Court,
E. D. Tennessee, N. D.

Oct. 9, 1980.

James W. Justice, Knoxville, Tenn., for plaintiff.

Jeffrey Axelrad, W. Russell Welsh, Tort Branch, Civil Section, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This case arises out of the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(j)–(1). Originally filed in this Court, the case was transferred to the United States District Court for the District of Columbia (*In re Swine Flu Immunization Products Liability Litigation*, MDL No. 330, Misc. No. 78–0040 (DCDC)), then remanded to this Court for trial.

Reba Inez Parham, plaintiff [1] alleged that she experienced the Guillain–Barre Syndrome (GBS) as a result of receiving a swine flu vaccination on October 19, 1976. Defendant admits that plaintiff received a swine flu vaccination, but denies liability on the grounds that plaintiff did not suffer from GBS, and alternatively, that even if she did, it was not caused by the vaccination.

### Findings of Fact

1. Plaintiff Reba Inez Parham was born on February 5, 1920.

2. In about 1950, plaintiff received a gunshot wound in the head. As a result, a metal plate was attached to her skull.

3. In 1975, plaintiff was committed for several months by the Gibson County Chancery Court to Western Tennessee State Psychiatric Hospital.

4. In May, 1976, plaintiff was found by that same court to be incapable of managing her own affairs and suffering from physical and mental weakness. She was thus declared incompetent and her brother, James Parham, was appointed her conservator.

---

1. This action was actually filed by James Parham as Conservator for Reba Inez Parham. For the sake of simplicity, however, we will refer to Reba Inez as "plaintiff."

5. From March until October 24, 1976, plaintiff resided at the Laura Harlan Mack Morris Home for the elderly of Gibson County, in Trenton, Tennessee. The Mack Morris Home is not a nursing care facility. It accepts as residents only people over fifty years old who are able to care for their own personal needs, which includes getting to the table. (Ex. 9). The staff keeps no records or notes regarding residents' conditions.

6. Plaintiff received a swine flu vaccination (Monovalent) on October 19, 1976.

7. On October 24, 1976, plaintiff moved from the Mack Morris Home to her brother's home in Oak Ridge, Tennessee. Ms. Belle Chapman, resident manager of the Mack Morris Home, testified that she initiated the move because she had observed since the morning of October 22 that plaintiff was having trouble walking. There was also evidence that plaintiff was unable to control her temper and that she repeatedly physically abused her roommate. (Ex. 11). Ms. Chapman denied that this was the reason for her transfer.

8. On October 27, 1976, plaintiff was examined by Dr. Charles B. Gurney. He found increased deep tendon reflexes on the left side.

9. Plaintiff was admitted to Lake City Nursing Home on November 5, 1976. She would stay there through 1977, except for approximately two months she spent in hospitals. While at the nursing home, she fell several times, requiring emergency treatment on November 21 for a laceration above her right eye.

10. On November 21, a nurse noticed that the metal plate on plaintiff's skull was protruding about ⅛ inch.

11. Plaintiff was admitted to East Tennessee Baptist Hospital on December 27, 1976.

12. She was examined by Dr. Bertram Henry, a board–certified neurologist, on December 27. He was aware both of the metal plate and of the swine flu vaccination in October. Dr. Henry found reflexes to be present in the arms and legs bilaterally (Ex.

6). He also found the right thigh to be approximately 2¾ inches shorter than the left. X–rays of plaintiff's hip were taken that day. Dr. Henry testified that in his opinion plaintiff did not have GBS.

13. The X–rays were submitted to Dr. Jeromy J. Kaye, a radiologist at Vanderbilt University Hospital. The parties agreed to be bound by his findings. Dr. Kaye states that the X–rays reveal a constellation of three fractures in the right hip area. He opines that it is unlikely that all three were the result of a single traumatic event. Dr. Kaye feels that the central acetabular fracture most likely occurred first, and states further that because of the erosion of the right femoral neck it appears that plaintiff was ambulating and weight bearing on that hip after the fracture. This led Dr. Kaye to question whether plaintiff was suffering from a sensory defect. The fracture of the right femoral neck appeared to Dr. Kaye to have occurred since the acetabular fracture. The parties agree that Dr. Kaye estimated that the hip fracture was *at least* two months old on December 27, 1976. (It should be noted that both radiologists at Baptist Hospital who viewed the X–rays when they were taken characterized the hip fractures as "old." Ex. 6).

14. Plaintiff received a total hip replacement on January 7, 1977.

15. Dr. Kaye also viewed X–rays of plaintiff's spine taken January 5, and February 16, 1977. He found a compression fracture of the 11th thoracic vertebrae, a mild compression deformity at the 12th thoracic vertebrae and a fracture of the 4th lumbar vertebral body to be present on January 5. These were of indeterminate age. By February 16, there was also present a fracture of the 5th lumbar vertebrae.

16. The records of Baptist Hospital show that plaintiff was walking, although with difficulty, on January 22. She returned to Lake City Nursing Home on January 28, 1977.

17. Between January 28 and February 16, 1977, plaintiff complained of an inability

to move her legs on some occasions, but on other occasions was able to walk. (Ex. 8).

18. On February 16, 1977, plaintiff was admitted to Fort Sanders Presbyterian Hospital primarily for removal of the metal plate protruding from her skull. Dr. Stephen E. Natelson performed the procedure and also did a shunt for hydrocephalus. There were no apparent complications from the surgery.

19. While at Fort Sanders Hospital, plaintiff was primarily under the care of Dr. Stephen E. Natelson, a Knoxville neurosurgeon, who testified at trial. Dr. Natelson testified that plaintiff had no deep tendon reflexes in her lower extremities bilaterally;[2] that the protein level in plaintiff's spinal fluid was very high with a value of 190; and that the electromyogram conduction tests indicated lower motor neuron disease. Though no myelogram was taken, he decided that the compression fractures at the L4, L5 and T 12 vertebrae, which were evidenced in the X–rays, were not the cause of plaintiff's motor neuropathy. Based on his findings of absence of reflexes, flail feet demonstrating weakness, and plaintiff's history of having received a swine flu shot in October, 1976, Dr. Natelson concluded that plaintiff had GBS.

20. Drs. Bruce Avery and Marvin Spiegel were consulted on the case. Dr. Avery determined that there was no evidence of a neoplasm. His impression was that plaintiff was suffering from bilateral severe peripheral neuropathy with lower motor neuron loss, etiology uncertain. He suggested that plaintiff's condition could have been due to either some type of progressive lower motor neuron disease or some spinal lesion, but discounted the latter in view of the apparent absence of sensory changes. He also noted multiple osteoporotic lesions, which he attributed to a hysterectomy at age thirty–six. Dr. Marvin Spiegel conducted an electromyographic examination (nerve conduction test) and concluded that plaintiff suffered from a diffuse bilateral

motor neuron disease of unknown etiology. His report indicates, however, that the nerve conduction studies weighed against peripheral neuropathy generally, but suggested possible multiple levels of radiculopathy (disease or injury of the nerve roots).

21. Dr. Natelson testified that radiculopathy can be caused by pressure on the spinal nerves, and can cause flail feet when radiculopathy is present at L4 and L5 levels. Although a myelograph could have pinpointed the existence of radiculopathy, one was never done on plaintiff. Dr. Natelson said that he and Dr. Avery discounted the possibility of radiculopathy because of the apparent lack of sensory loss.

22. Dr. William Paulsen, a board–certified neurologist, testified that he attributed plaintiff's problems to a radiculopathy due to arthritis and the compression fractures of the vertebrae. He ruled out GBS because he felt that with the legs involved to the degree indicated, GBS would also necessarily affect the arms. Dr. Paulsen also stated that the increased protein in the spinal fluid could be attributed to the old head injury.

23. Guillain–Barre Syndrome is a disease of the peripheral nervous system. Symptoms appear when the myelin sheath, a protein–like coating of the nerve fibers, is for some reason destroyed, resulting in impairment of nerve impulse conduction.

24. From the expert testimony introduced at trial, we find that GBS is generally characterized by the following symptoms:

(a) Symmetrical motor weakness, generally starting with the toes and feet and ascending bilaterally.

(b) Absence or severe impairment of the reflexes in arms and legs.

(c) Lack of significant sensory impairment, although there may be tingling and numbness in toes and fingers at beginning stages.

(d) Increased protein in the cerebrospinal fluid, without accompanying increase in cell count.

2. Although Dr. Natelson had noted that plaintiff had reflexes on his prehospitalization examination report of February 11, he testified at

trial that he had not checked for them at that time due to her confinement in a wheelchair.

(e) Slowing of nerve conduction as evidenced by electromyogram (EMG).

25. The experts agree that the only established relationship between swine flu vaccination and GBS is statistical. While this may suggest a causal relationship, it does not establish one.

26. The Government does not dispute that the vaccination received by plaintiff *may* cause GBS. It argues, however, that the chances that a causative relationship exists becomes virtually negligible after ten weeks.

*Conclusions of Law*

1. This Court has jurisdiction over the claim of Reba Inez Parham pursuant to 28 U.S.C. § 1346(b) and 42 U.S.C. § 247b.

2. The issues before this Court are:

(a) Did plaintiff suffer from Guillain–Barre Syndrome? and

(b) If so, was her GBS caused by the swine flu vaccination?

3. To prevail, plaintiff must prove her case by a preponderance of evidence. *Memphis St. Ry. Co. v. Cavell*, 135 Tenn. 462, 187 S.W. 179 (1916). By preponderance of evidence is meant simply evidence of greater weight, or more convincing, than that offered in opposition to it; that evidence which yields the greater probability of truth.

4. We hold that plaintiff has not established by a preponderance of the evidence that she ever suffered from Guillain–Barre Syndrome. The weakness of her lower extremities and her impaired walking ability are equally explained by her broken hip and the compression fractures of her vertebrae.

Accordingly, it is ORDERED that judgment enter in this case for defendant, and that the case be, and the same hereby is, dismissed.

Order accordingly.