Dick SAXE, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. C78–1411A.

United States District Court,
N.D. Ohio, E.D.

Aug. 19, 1983.

**136**

David Bertsch, Donald A. Powell, Buckingham, Doolittle & Burroughs Co., L.P.A., Akron, Ohio, for plaintiffs.

Dennis P. Zapka, Patrick M. McLaughlin and Randolph Baxter, Asst. U.S. Attys., Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION

KRENZLER, District Judge.

This action was commenced on October 24, 1978, when plaintiffs, Dick and Joyce Saxe, filed a complaint alleging personal injury against the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq. (hereinafter FTCA), and the National Swine Flu Immunization Program of 1976 (hereinafter Swine Flu Act), formerly codified at 42 U.S.C. § 247b(j)–($l$).[1] Plaintiffs seek to recover compensatory damages for injuries by plaintiff Dick Saxe following inoculation with a Swine Flu vaccine. Mr. Saxe contends that he contracted a disease known as Guillain-Barre Syndrome (hereinafter GBS) as a result of receiving the Swine Flu inoculation. This action, along with others filed nationwide which claimed injuries as a result of receiving a Swine Flu inoculation, was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for consolidated pretrial proceedings pursuant to the provisions of 28 U.S.C. § 1407. This case was eventually remanded to this Court for additional discovery and trial. In the course of the consolidated pretrial proceedings, numerous depositions of national experts were taken, several of which were introduced into evidence at this trial. The Final Pretrial Order entered by the Multidistrict Court provides that where it is stipulated or otherwise determined that a plaintiff has developed GBS following a Swine Flu vaccination, no specific theory of liability need be established in order to recover money damages. In such a case, the plaintiff need only prove a causal relationship between the vaccination and the onset of GBS. In the instant case, the defendant contests plaintiffs' claim that Dick Saxe contracted GBS, and the government further asserts that even if Dick Saxe did suffer from GBS, it was not caused by his Swine Flu vaccination. Thus, two of the issues which must be decided by this Court are as follows:

1. Whether Dick Saxe suffered from GBS.

---

1. The National Swine Flu Immunization Program of 1976 was an attempt by the federal government to inoculate the adult population of the United States against the perceived threat of a Swine Flu epidemic. The program was commenced on October 1, 1976 and suspended on December 16, 1976. The historical beginnings of this inoculation effort and the genesis of the Swine Flu program has been exhaustively discussed by other courts. See: *Hunt v. United States*, 636 F.2d 580, 589–593 (D.C.Cir.1980); *Unthank v. United States*, 533 F.Supp. 703 (D.Colo.1980).

2. If Dick Saxe suffered from GBS, whether the GBS was caused by the Swine Flu vaccination.

Two other issues raised by the plaintiff are as follows:

3. Whether plaintiff Dick Saxe's neurological disease (whatever it may be called) was caused by the Swine Flu vaccination.

4. Whether the United States was negligent in failing to adequately warn Mr. Saxe of the risks of the Swine Flu vaccination.

On December 1, 1982, this matter came on for a bench trial pursuant to the provisions of the FTCA and Swine Flu Act. See *Ducharme v. Merrill-National Laboratories*, 574 F.2d 1307 (5th Cir.1978). The issues of liability and damages were bifurcated by the Court. During the trial of this matter, the Court received testimony and exhibits into evidence including lengthy expert medical testimony, both video taped and live, and extensive medical reports and studies of GBS. This Court, having considered all of the evidence and the memoranda submitted by the parties, incorporates its Findings of Fact and Conclusions of Law in this Memorandum of Opinion and Order. Fed.R.Civ.P. 52(a).

FINDINGS OF FACT

Plaintiff Dick Saxe is a 48-year-old white male who received a Swine Flu vaccination on December 3, 1976 at the Munroe Falls Town Hall in Summit County, Ohio.

Subsequently, on January 20, 1977, Mr. Saxe saw his family physician, Dr. Reulbach, with a chief complaint of numbness and tingling in the ball of his left foot which, Mr. Saxe said, had begun on or about December 6, 1976 and later spread to his right foot and hands. By January 20, 1977, the numbness involved Mr. Saxe's tongue and mouth area. Dr. Reulbach noted the following history of Dick Saxe:

(1) Tingling in the terminal phalanges of both hands for three weeks;

(2) Tingling in the tip of the tongue for two days;

(3) Tingling in his toes which had improved during last three weeks.

A neurological examination of Mr. Saxe was also performed by Dr. Reulbach at the January 20, 1977 office visit. This neurological examination revealed a slight decrease in pin-prick sensation in the terminal phalanges of the hands, but otherwise the examination was normal.

Upon referral by Dr. Reulbach, Mr. Saxe saw Dr. Tucker, a neurologist, on February 28, 1977. Dr. Tucker's examination revealed Mr. Saxe's chief complaint was numbness in the feet and hands. Dick Saxe also complained of having bowel trouble and related symptoms of decreased awareness of urination and decreased force of urinary stream. Additionally, Mr. Saxe reported having a disturbance of his sense of taste and numbness in his tailbone and anus. Dr. Tucker performed a neurological examination which revealed the following:

(1) Reflexes were brisk throughout.

(2) No abnormal toe signs.

(3) Pin sensation was decreased to above the knee and it was intact in the hands.

Dr. Tucker admitted Mr. Saxe to Hillcrest Hospital on March 11, 1977, and Mr. Saxe remained there until March 29, 1977. Upon admission to the Hospital, the general physical examination was normal. The neurological examination showed brisk tendon reflexes and decreased pin sensation to above the knees. Dr. Tucker noted that Mr. Saxe complained of weakness at the time Mr. Saxe was admitted to Hillcrest Hospital. The Hillcrest Hospital records show that during the course of Mr. Saxe's hospitalization, he remained ambulatory and showed improvement with bed rest. On discharge, Mr. Saxe was reported to have experienced an unsteadiness and was unable to maintain a normal gait.

Laboratory tests were performed during Mr. Saxe's hospitalization at Hillcrest. These tests revealed no abnormal mercury, lead or arsenic levels and a normal Schilling's test (i.e. no pernicious anemia).

A lumbar puncture procedure was performed on Mr. Saxe on March 15, 1977. The Cerebrospinal fluid protein level (CSF) was found to be elevated at 167 mg. per cent. On March 17, 1977, electrical and nerve conduction tests were performed by Dr. Wilbourn, an expert in electromyography (EMG) and nerve conduction studies, at the Cleveland Clinic. These tests found electrical evidence of neuropathy.

Dr. Tucker saw Dick Saxe in his office on April 14, 1977 with the following observations:

(a) pin prick sensation in lower extremities intact.

(b) taste returned.

(c) no essential change in his hands and feet.

(d) reflexes normal.

Mr. Saxe was admitted by Dr. Tucker to University Hospital for a rectal and sural nerve biopsy on May 4, 1977, where he remained until May 10, 1977. On his admission at this time, Mr. Saxe complained of an inability to write or grasp objects for any length of time.

The rectal biopsy of Mr. Saxe showed no evidence of amyloidosis. The sural nerve biopsy report by Dr. Roessmann, a neuropathologist at University Hospital, showed definite evidence of a neuropathy. The sural nerve biopsy report concluded that "the changes described are nonspecific; however, a metabolic origin seems most likely."

Dr. Mendell, a neuropathologist and professor of neurology and pathology at Ohio State University College of Medicine, found no evidence of abnormality in the tissue samples. A repeat lumbar puncture was performed on Mr. Saxe and his CSF protein was still elevated at 150 mg. percent.

On May 10, 1977, Dick Saxe was discharged from University Hospital by Dr. Tucker with a primary diagnosis of peripheral neuropathy, cause unknown. A later examination of Dick Saxe, by Dr. Tucker, continued to show active reflexes and an equivocal sensory deprivation (i.e. decreased pin-prick sensation characterized as

"effervescent"). Mr. Saxe still complained of numbness, pain and disability upon discharge.

Subsequently, on October 24, 1978, plaintiffs filed a complaint in this Court initiating this instant case.

At trial, plaintiffs' deposition evidence included the testimony of Dr. Reulbach, an internist who has been Mr. Saxe's family physician since 1966. Dr. Reulbach's testimony concerned Mr. Saxe's personal history, complaints, medical examination, and diagnosis. Defendant's deposition evidence included the testimony of Ms. Karen Joice who testified about the circumstances surrounding the inoculations at Munroe Falls Town Hall including the procedure employed and precautions exercised. Both plaintiffs and defendant introduced Multidistrict Litigation deposition testimony.

Regarding expert witnesses, plaintiffs' expert witnesses testifying at trial were:

(a) Dr. Mark Koltnow, a podiatrist, who testified concerning Mr. Saxe's personal history and complaints as well as Dr. Koltnow's examination and treatment of Mr. Saxe.

(b) Dr. Howard Shapiro, a neurologist, who reviewed Mr. Saxe's medical history and testified that he concluded Mr. Saxe suffered from a Guillain-Barre Syndrome variant.

(c) Dr. Howard Tucker, Mr. Saxe's treating neurologist and plaintiffs' chief witness, who testified concerning Mr. Saxe's history and complaints. Dr. Tucker also testified concerning his examination, treatment, medical findings, and various diagnoses of Mr. Saxe's neurological illness. Dr. Tucker testified that although he had ruled out Guillain-Barre Syndrome early in his treatment of Mr. Saxe, upon reconsideration, he concluded that Mr. Saxe did in fact suffer from Guillain-Barre Syndrome.

(d) Dr. Uros Roessmann, a senior pathologist at University Hospital, testified concerning his own pathological findings upon examination of Mr. Saxe's nerve biopsies.

Defendant's expert witnesses testifying at trial were:

(a) Dr. Edward L. Westbrook, a neurologist, who testified regarding his examination of Mr. Saxe on December 30, 1980. Dr. Westbrook testified that he concluded that Mr. Saxe's illness does not fit within the criteria established for Guillain-Barre Syndrome, and that Mr. Saxe suffered from a predominantly sensory neuropathy unrelated to Mr. Saxe's Swine Flu vaccination.

(b) Dr. Monroe Cole, a neurologist, testified that he agreed with the diagnosis and conclusions of Dr. Westbrook.

(c) Dr. Asa J. Wilbourn, an expert in electromyography (EMG)/nerve conduction testing, testified concerning Mr. Saxe's EMG and nerve conduction results which were made when Mr. Saxe was a patient at Hillcrest Hospital in 1977. Dr. Wilbourn testified that his findings though not inconsistent with a finding of Guillain-Barre Syndrome, are not diagnostic of Guillain-Barre Syndrome.

(d) Dr. Randall S. Krakauer, an immunologist, testified concerning the immunological aspect of GBS and his testimony specifically concerned epidemiological studies and the relationship between Guillain-Barre Syndrome and the Swine Flu vaccine as well as the relationship between epidemiological conclusions and immunologic processes in general.

Also testifying at trial were the plaintiffs, Dick and Joyce Saxe, themselves. Plaintiffs testified concerning Mr. Saxe's personal history and complaints subsequent to Mr. Saxe's Swine Flu vaccination.

## CONCLUSIONS OF LAW

■ This Court has jurisdiction over this matter pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Under the FTCA, the government is liable in damages to an injured party for injuries arising from a negligent or wrongful act or omission by its employees if a private person would be liable under the same circumstances in ac-cordance with the law of the state where the act or omission occurred. 28 U.S.C. §§ 1346(b), 2674. Usually, the plaintiff in a FTCA case would have to prove causation, liability, and damages in order to prevail. However, under the terms of the Final Pretrial Order entered by the Multidistrict Court, the government stipulated that a plaintiff who proves that he contracted GBS after receiving a Swine Flu shot, need only establish causation and damages, not liability. See: *In Re Swine Flu Immunization Products Liability Litigation,* 89 F.R.D. 695 Final Pretrial Order, MDL Docket No. 330, Misc. No. 78–0040 (D.D.C. 1979).

### I.

The primary issue in this case is whether Mr. Saxe suffered from GBS. GBS has been described as a neurological disorder, inflammatory in nature, which affects the peripheral, as opposed to the central, nervous system.[2] *Alvarez v. United States,* 495 F.Supp. 1188, 1194 (D.Colo.1980). The GBS condition was first described in 1859 by Dr. Landry as a disease of French soldiers characterized by symmetrical weakness, loss of reflexes, and an elevated protein level in the cerebrospinal fluid. GBS is described as a set of neurological symptoms, rather than a specific biological disorder. GBS was described in 1916 by Doctors Guillain, Barre, and Stohl. *See* Dyck, et al., Ch. 56, *Inflammatory Polyradiculoneuropathies,* at 1110 (1975) (DFX).

Medical science has not yet established the syndrome's exact etiology. The disease has, however, been associated with numerous antecedent medical events. Most common of these medical events are viral infections and vaccines. Although mechanisms by which GBS occurs are not yet proven, it is believed that the disease is an autoimmune response to an antigenic insult. In other words, the antibodies which are produced as a result of introducing an antigen or vaccine into the body become misdirect-

---

**2.** The central nervous system consists of the brain, brain stem, and the spinal cord. The peripheral nervous system begins where the nerves leave the spinal column and extends throughout the body.

ed and attack the myelin sheath which surrounds nerves instead of attacking the antigen which was introduced. Myelin is a white fatty substance which protects, insulates, and nourishes the peripheral nerves. The result of this attack on the myelin sheath is known as demyelination. Demyelination impairs the nerve's ability to conduct electrical impulses from the brain which control the reflexes and movement of certain muscles.

The term GBS describes a collection or constellation of neurological symptoms and findings; it is not a single well-defined organic disorder. Thus, the features which allow a positive diagnosis of GBS include clinical, laboratory and electrodiagnostic criteria. Asbury, *Diagnostic Considerations in Guillain-Barre Syndrome*, 9 Annals of Neurology 1 (Supp.1981).

## NINCDS CRITERIA

In an attempt to aid physicians to recognize GBS diagnostic boundaries, an *ad hoc* committee was convened by the National Institute of Neurological and Communicative Disorders and Stroke (hereinafter "NINCDS"). This committee formulated and published a set of criteria to aid the diagnosis of GBS. See: NINCDS Criteria, 1978 Ann.Neur. 3:565–566 (DFR, DFSF). The NINCDS Criteria were established by a panel of experts and reflect the consensus of opinion on the diagnostic features of GBS. *Hixenbaugh v. United States*, 506 F.Supp. 461, 464–465 (N.D.Ohio 1980).[3]

There are two features listed as required under the NINCDS Criteria: (1) progressive bilateral motor weakness and (2) areflexia (loss of tendon reflexes). The severity of the weakness may cover a wide spectrum from mild failure of muscle coordination, known as ataxia, to total paralysis of every motor and cranial nerve. Usually, the weakness is first noticed in the legs and gradually ascends through the body. Rarely are there solely sensory symptoms in the absence of motor debility. Tendon reflexes are usually abolished in affected areas although a flicker of activity may remain in mild cases. Arnason, *Inflammatory Polyradiculoneusopathies, supra*, at 1121–1123 (1975). The onset of symptoms is typically subacute.[4] Evolution of the syndrome is complete after two weeks in over fifty percent of the cases; after three weeks in eighty percent; and after four weeks in ninety percent of the cases. Satisfactory recovery occurs by the end of four to six months in eighty-five percent of the cases, although some patients have permanent deficits of varying severity. *Arnason, supra*, at 1121. The criteria also list certain clinical, laboratory, and electrodiagnostic findings as "strongly supportive" of the diagnosis of GBS. The two most important clinical signs under this category are progression of the motor weakness and a relatively symmetrical evolutionary disease process (i.e. if one limb is affected, the opposite is as well). A significantly large number of GBS patients also show evidence of slowed nerve conduction on electrodiagnostic testing and an increase of cerebrospinal fluid protein (i.e. over 40–45 m.g.) during the acute phase of the illness.

The criteria also lists six features described as "casting doubt" on the diagnosis of GBS. These include:

---

3. See also: *Lima v. United States*, 508 F.Supp. 897, 899–900 (D.Colo.1981); *Heyman v. United States*, 506 F.Supp. 1145, 1148 (S.D.Fla.1981); *Parham v. United States*, 503 F.Supp. 70, 72–73 (E.D.Tenn.1980); *Alvarez, supra*, 495 F.Supp. 1188, 1195–96 (D.Colo.1980); *Ary v. United States*, Civil Action No. C79–243–C (E.D.Okla., February 27, 1981); *Bean v. United States*, 533 F.Supp. 567 (D.Colo.1980); *Cox v. United States*, Civil Action No. 78–359–1 (S.D.Iowa, May 2, 1981); *Fritschen v. United States*, Civil Action No. C79–1031 (D.Kan., January 15, 1981); *Gicas v. United States*, 508 F.Supp. 217 (E.D.Wis.1981);

*Matey v. United States*, Civil Action No. 79–416–HB (D.N.M., January 15, 1981); *Schultz v. United States*, Civil Action No. C78–0159–K (S.D.Cal., October 17, 1980); *Swafford v. United States*, Civil Action No. 79–F1070 (D.Colo., December 30, 1980); and *Warner v. United States*, 522 F.Supp. 87 (M.D.Fla.1981).

4. Subacute is defined as being between acute and chronic. Acute is defined as sharp, having a short and relatively severe course. Chronic is defined as persisting over a long period of time.

1) notable persistent asymmetry of weakness.

2) persistent bladder or bowel dysfunction at onset or which, after appearance, persists.

3) history of diabetes with prior neuritic symptoms.

4) more than 50 mononuclear leukocytes per cubic millimeter in CSF (cerebrospinal fluid).

5) presence of polymorphonuclear leukocytes in CSF.

6) sharp sensory level.

MLDL Doc. No. 589 See: *Hunt v. United States*, Civil No. C79–253 (N.D.Ohio April 8, 1982).

The NINCDS criteria purposely define only the "core disorder" and thus, the precise "diagnostic limits of the disorder are still uncertain." *Asbury, supra,* at 1 and 3. Nonetheless, the NINCDS criteria facilitate the diagnoses of GBS. In fact, all of the expert witnesses, in the instant case, acknowledge the universal adoption and use of the NINCDS criteria (See Tr. 161, Dr. Shapiro; Tr. 496, Dr. Westbrook; Tr. 825, Dr. Cole; Tr. 1068, Dr. Wilbourn, and Depo. of Dr. Reulbach, p. 52).

Therefore, the starting point of this inquiry is to determine whether and to what extent Mr. Saxe's symptoms fall within the NINCDS criteria.

The NINCDS criteria name two features which must be present before a diagnosis of GBS can be entertained and sustained: (1) progressive motor weakness of more than one limb and (2) pareflexia (loss of tendon reflexes).

The office chart of Dr. Reulbach, Mr. Saxe's family·physician, who examined Mr. Saxe on January 20, 1977, reveals no notation of weakness. (JT IV). Plaintiffs' chief expert witness, Dr. Tucker, a neurologist, made no notation of weakness upon examination of Mr. Saxe on February 28, 1977. Dr. Tucker saw Mr. Saxe again on March 12, 1977. At this time Dr. Tucker's note stated that Mr. Saxe "has picture of aresthesia and weakness in 4 extremities." (JT 11 p. 10). It is not clear from that note whether this was an objective finding of weakness or a subjective complaint made by Mr. Saxe.

Dr. Tucker's discharge summary dated March 29, 1977 revealed that a neurologic examination was performed by him upon Mr. Saxe's admission to Hillcrest Hospital which indicated "brisk tendon reflexes and decreased pin to above the knees." (JT 11 p. 2, Tr. 362). Contrary to the fact that a complaint of weakness was made by Mr. Saxe, the objective admission record concludes that "no motor weakness was noticed." (JT 11 p. 8). Further, there is no mention of weakness in the nurse's notes made during the time Mr. Saxe was at Hillcrest Hospital. The University Hospital records reveal that upon motor examination, Mr. Saxe presented as "5/5 proximal and distal in the upper and lower extremities." (JT 111). The "5/5" notation indicates normal strength. (Tr. 176, 372, 534). The record did, however, indicate a slightly decreased dorsiflexion in the right big toe. (JT 11 p. 16).

Dr. Westbrook's examination of Mr. Saxe revealed a history of subjective complaints of weakness but, upon objective examination of Mr. Saxe, Dr. Westbrook found no demonstration of such weakness.

Thus, this Court finds that plaintiffs have failed to present evidence to support an objective finding that Mr. Saxe exhibited clinical manifestations of motor weakness.

The second clinical manifestation of GBS which the NINCDS states must be present before a diagnosis of GBS can be sustained is areflexia or loss of tendon reflexes. Mr. Saxe's initial examination by Dr. Reulbach on January 20, 1977, reveals that Mr. Saxe's reflexes were found to be normal. (JT IV). Dr. Tucker's examination on February 28, 1977 revealed that Mr. Saxe's reflexes were found to be "brisk." (JT V, Tr. 253). Dr. Shapiro notes that Mr. Saxe "had reflexes throughout." (Tr. 173). This diagnosis of Dr. Shapiro corresponds with the conclusion reached by Dr. Cole (Tr. 867) and Dr. Wilbourn (Tr. 1074).

Likewise, the medical records presented support the finding of the presence of re-

flexes throughout the course of Mr. Saxe's illness. (JT II–V). Follow-up examinations of Mr. Saxe by Dr. Tucker on April 14, 1977, June 27, 1977, and October 20, 1980, show that the reflexes remained normal.

The difficulty in accepting as GBS, cases in which reflexes are preserved, stems from the physiology of GBS. The destruction of myelin, characteristic of GBS, results in an interruption or complete block of the reflex arc. Thus, when demyelination occurs, the reflexes become absent or diminished.

In *Hixenbaugh v. United States*, 506 F.Supp. 461 (N.D.Ohio, 1980), and in *Hunt v. United States*, Civil No. C79–153 (N.D. Ohio, April 8, 1982), Judge Krupansky stated that "the first two elements listed, *supra,* the progression of symptoms [i.e. of motor weakness] and areflexia, are considered requirements for a diagnosis of GBS." *Hunt, supra,* at p. 8.

Plaintiffs have failed to establish that Mr. Saxe suffered from two elements necessary for a diagnosis of GBS: areflexia and motor weakness.

Plaintiffs did, however, submit evidence that Mr. Saxe had an elevated cerebrospinal fluid protein level which is one common symptom of GBS. Also, Mr. Saxe was reported to have complained of weakness on rare occasions. In light of these facts, this Court will take another look at Mr. Saxe's symptoms and the NINCDS criteria.

In addition to the required features, the NINCDS listed several factors supportive of the diagnosis of GBS. These factors include:

(1) Progression: symptoms and signs of motor weakness develop rapidly, but cease to progress by four weeks into the illness. More than 90 percent will reach nadir by four weeks.

While the authors of the NINCDS criteria recognize some variance in progression of symptoms, there is nonetheless, a definable range of progression beyond which an illness can no longer be considered GBS. There is no dispute that Mr. Saxe's illness progressed from December 6, 1976 through March 11, 1977, a period of fourteen weeks.

This length of time is beyond that time listed in the NINCDS criteria. Even Dr. Tucker, plaintiffs' witness, made note that Mr. Saxe's "course is too prolonged for Guillain-Barre" in his Hillcrest Hospital notes. (JT 11). Dr. Tucker also concluded in Mr. Saxe's University Hospital records that the "progressive picture is against G–B."

(2) Mild sensory symptoms or signs.

The record is full of testimony concerning Mr. Saxe's objective sensory symptoms that range from numbness, tingling and pain to decreased pin-prick sensations. These symptoms were not mild, but rather dominated over Mr. Saxe's motor deficiencies. (See e.g. JT 11, JT 111, JT IV, JT V). Dr. Westbrook's diagnosis of Mr. Saxe's illness was a "predominantly sensory neuropathy." (Tr. 562). Dr. Cole also characterized the illness of Mr. Saxe as a "sensory polyneuropathy of unknown course." (Tr. 881). Substantial sensory loss experienced by Mr. Saxe is not characteristic of GBS. See: *Symonds v. United States,* No. C79–8243 (S.D.Fla. Nov. 18, 1982).

(3) Recovery usually begins two to four weeks after progression stops; most patients recover functionally.

Mr. Saxe contends that he remains to the date of trial, physically, totally disabled. Objectively, the record reflects a prolonged period of partial improvement of sensory symptoms without recovery from numbness in the feet. (JT III, V). Dr. Shapiro examined Mr. Saxe in October of 1982, and upon neurologic examination, found Mr. Saxe's symptoms were not consistent with findings expected from a patient who experienced the onset of GBS six years prior. (Tr. 137–38).

Additionally, regarding the NINCDS criteria features listed as casting doubt on the diagnosis of GBS, *supra* at p. 12, it is significant to note that one of these features is persistent bladder or bowel dysfunction at onset or which, after appearance, persists. The record reveals that Mr.

Saxe suffered from both bladder and bowel dysfunction which persisted for months. These symptoms were noted by plaintiffs' witnesses, Dr. Reulbach (JT IV) and Dr. Tucker (JT V, Tr. 252). The Hillcrest records reflect a loss of sphincter control since December 1976. (JT II). The symptoms of bowel incontinence and decreased force of urination, did not begin to improve until hospitalization in March of 1977. Although it cannot be said that sphincters may never be involved in a patient suffering from GBS, if they are involved, it is only in the very severely affected patient and is involved later on in the illness. (Tr. 657, Dr. Westbrook; Tr. 869, Dr. Cole).

The Court is mindful of the evidence presented which showed that Mr. Saxe did have some features which may support a diagnosis of GBS. For example, Mr. Saxe's cerebrospinal fluid (CSF) level was elevated after the first week of symptoms, and Mr. Saxe had counts of 10 or fewer mononuclear leukocytes in the CSF. Additionally, there are electrodiagnostic features consistent with GBS. Approximately eighty percent of GBS patients will evidence nerve conduction slowing or blocking at some point. Upon examination by Dr. Wilbourn, Dick Saxe presented nerve conduction features of "a generalized, mixed motor-sensory peripheral polyneuropathy, moderate in degree, and consisting almost solely of segmental demyelination mainly distally." (JT 11).

The presence of these supportive features, however, is not enough to sustain a finding of GBS particularly in light of the fact that the features necessary for and strongly supportive of a diagnosis of GBS were absent in Mr. Saxe.

Yet Mr. Saxe's treating neurologist, Dr. Tucker, a well-qualified neurologist, did testify at trial that he believed Mr. Saxe was suffering from a GBS variant. Dr. Tucker testified that he arrived at this diagnosis after a long period and by a process of eliminating all other diseases. Indeed, Dr. Tucker's medical records refer to Mr. Saxe's illness as "peripheral neurites, cause unknown, question past vaccinal" on the Hillcrest Hospital discharge summary (JT II); he characterized Mr. Saxe's illness as "recurrent relapsing peripheral neuropathy on March 23, 1977 (JT II); Dr. Tucker called Mr. Saxe's illness "severe peripheral neurites on May 5, 1977 (JT III; and upon Mr. Saxe's discharge from University Hospital, Dr. Tucker lists the primary diagnosis as "peripheral neuropathy, cause unknown." (JT III). Dr. Tucker testified that he now believes that Mr. Saxe's illness should be called a GBS variant. While this Court is sympathetic to the difficulty in diagnosing Mr. Saxe's illness particularly in light of the fact that no doctor has testified that Mr. Saxe had any other particular neuropathy, this Court is unable to find substantial evidence to support the conclusions of Doctors Tucker and Shapiro that Mr. Saxe suffered from a GBS variant. In order to find that a patient is suffering from a GBS variant, the patient must demonstrate substantial objective symptoms of GBS. In the instant case, Mr. Saxe failed to establish by a preponderance of the evidence that he had two major symptoms of GBS. Mr. Saxe failed to establish motor involvement or areflexia.

Plaintiffs, through the testimony of their witnesses Drs. Tucker and Shapiro, urge this Court to expand the established definition of GBS in order to afford plaintiffs the relief they seek. This Court is not persuaded by the arguments presented in favor of such expansion of the GBS definition.

Rather, this Court is persuaded by the testimony of Dr. Krakauer, an immunologist who is the head of the clinical immunology section, Department of Rheumatic Diseases at the Cleveland Clinic. Upon questioning by the Court, Dr. Krakauer testified as follows:

Q. So anything but the standard, traditional GBS is not GBS?

A. Well, yes, I would say that.

I am not sure it is really saying anything of value to say that.

Q. Well, if you had basically GBS symptoms with a couple of other little ones, does that make it a GBS?

A. Yes, it would be. You really have to have major symptoms of motor involvement and areflexia. Those are two real keys.

One may argue, yes, do you have GBS without major motor involvement?—well, maybe rarely.

Can you have GBS where there is not areflexia—well, perhaps rarely, but you really have to have something to say it is GBS.

If you start letting go of all your major criteria, you really have lost your definition. (Tr. 1273–1274).

Further, this Court is persuaded by the testimony of Dr. Wilbourn, a nationally-known specialist in electromyography and head of the EMG laboratory at the Cleveland Clinic, who testified that the results of Mr. Saxe's tests show that Mr. Saxe was not suffering from GBS, but rather from an illness that falls into the general category of segmental demyelinating neuropathies.

When questioned concerning Mr. Saxe's illness, Dr. Wilbourn testified:

A. I think the only etiology that suggested Guillain-Barre syndrome were the laboratory findings, neither of which are diagnostic etiology.

He had an elevated spinal fluid protein which you have with Guillain-Barre syndrome, *and a lot of other things;* and he had EMG findings that put him into the acquired segmental demyelinating polyradiculoneuropathy group, *but there are a lot of other diseases and entities in that group as well;* so there is nothing diagnostic about either of those two laboratory studies.

Again, the diagnosis was that the clinical history and findings just don't fit it at all, as far as I could see.

\* \* \* \* \* \*

I can't see how he had Guillain-Barre syndrome at all, except for the two laboratory studies, and obviously Dr. Tucker was having the same problem when he referred him to me, and when he admitted him in May, he was still trying to find a diagnosis for him. (Tr. 1073, 1075). (emphasis added).

In light of the foregoing, this Court is constrained to find that plaintiffs have failed to meet their burden of establishing by a preponderance of the evidence, that Mr. Saxe was suffering from GBS.

## II.

Since this Court finds that Mr. Saxe did not suffer from GBS, the Court need not address the second issue of whether the GBS was caused by the Swine Flu vaccination.

## III.

Plaintiffs argue that even if this Court finds that Mr. Saxe did not suffer from GBS, his illness, whatever it is, was nonetheless caused by his Swine Flu vaccination on December 3, 1976.

The government argues that GBS is the only neurological illness for which there is objective evidence of a causal association with the Swine Flu shot.

In a Federal Tort Claims Act case, the federal courts must look to the law of the state in which the tort allegedly took place to determine the plaintiff's burdens. Under Ohio law, a plaintiff seeking to recover damages for an injury must establish a proximate cause for the injury by a preponderance of the evidence. *Ohio Fair Plan Underwriting Assn. v. Arcara,* 65 Ohio App.2d 169, 417 N.E.2d 115 (1979); *Shapiro v. Burkons,* 62 Ohio App.2d 73, 404 N.E.2d 778 (1978); *Rathbun v. Humphrey Co.,* 94 Ohio App. 429, 113 N.E.2d 877 (1953). Mere temporal relationship between a Swine Flu vaccination and a subsequent illness is not sufficient, in itself, to establish causation. *MacEwen v. United States,* 525 F.Supp. 1063 (M.D.Ala.1981); *Spruell v. United States,* No. 79–418–C (E.D.Ok. Nov. 3, 1981). The burden of establishing causation can only be satisfied by expert testimony. *Schultz v. Wallace,* 115 Ohio App. 26, 184 N.E.2d 543 (1961).

Courts trying Swine Flu cases have consistently rejected a link between the Swine

Flu shot and illnesses other than GBS. *Hixenbaugh, supra,* at 469; *White v. United States,* Civil No. C78–14Y (N.D.Ohio July 31, 1981); *Golbinec v. United States,* Civil No. C80–213 (N.D.Ohio September 1, 1982).

 The difficulty in finding a causal relationship between the Swine Flu vaccination and neurological illnesses other than GBS is because there is a lack of epidemiologic data to establish that the rate of non-GBS illnesses following the Swine Flu program was higher than the expected normal incidence of those disorders in the general population. (See Tr. 550, 1226). Since plaintiff was unable to present studies or other medical evidence to establish that a disorder such as the one suffered by Mr. Saxe occurred in the vaccinated population with a frequency greater than by chance, this Court finds that plaintiffs have failed to meet their burdens of proving that it is more likely than not that the neuropathy which Mr. Saxe suffers from was caused by the Swine Flu vaccine. See: *Styler v. United States, supra; Adelson v. United States,* 523 F.Supp. 459 (N.D.Cal.1981); *Knight v. United States,* C80–0165–L(B) (W.D.Ky. Sept. 19, 1982); *Sparks v. United States,* No. 80–F–955 (D.Colo. Nov. 17, 1981).

Plaintiffs argue that the onset of Mr. Saxe's illness three days after his vaccination is indicative of a causal relationship between his illness and the Swine Flu vaccination.

Dr. Krakauer, the only immunologist to testify at trial, was asked whether in his opinion, Mr. Saxe's symptoms were causally related to the receipt of the Swine Flu vaccination:

Q. Now, I want you to assume for the purposes of this hypothetical that a patient has a swine flu shot and then began to experience symptoms of numbness or tingling three days later.

Do you have an opinion, based on a reasonable degree of medical certainty, as to whether the onset of those symptoms are causally related to the receipt of the swine flu vaccination?

A. Yes.

Q. What is that opinion?

A. I could not relate the two through immune mechanisms.

Q. And that opinion is based upon a reasonable degree of medical certainty?

A. Yes. (TR. 1204).

Although plaintiffs may have shown a temporal relationship between the time Mr. Saxe had his first symptoms and the Swine Flu vaccine, this temporal relationship alone will not support a finding of a causal relationship. See: *Debuhr v. United States,* No. 80–1247 (D.Kan. June 21, 1981); *MacEwen v. United States, supra; Spruell v. United States, supra.*

Plaintiffs also argue that if this Court were to find that Mr. Saxe did not have GBS, that this Court find that Mr. Saxe nonetheless suffered from a GBS variant for which a causal relationship existed. On the issue of GBS variants and causal relationships to the Swine Flu vaccination, this Court is persuaded by the testimony of Dr. Krakauer, an immunologist, who stated:

We can define and redefine GBS in variants, but the only important thing is that the connection made is what was the definition used by the people who did the original Schonberger study, the neurologists doing the original reporting, the connection that was made with the immunization and the incidence of GBS. To them GBS neuropathy was a classical or the commonly used definition, and although there are people that claim variants, it really wasn't the definition that was being used, that they were looking for real GBS. (Tr. 1272–1273).

In light of the foregoing, this Court finds that plaintiffs have failed to prove by a preponderance of the evidence that Mr. Saxe's illness was causally related to his Swine Flu inoculation for three reasons: 1) Mr. Saxe did not have GBS as that term was used in the pretrial stipulation; 2) Mr. Saxe did not have GBS as that term was used in the Schonberger study; and 3) plaintiffs did not prove that the neuropathy from which Mr. Saxe suffered was caused

by the Swine Flu vaccine. Accord: *Styer v. United States, supra,* at 19.

## IV.

Plaintiffs also allege that the United States was negligent in failing to adequately warn Mr. Saxe of the risks of the Swine Flu vaccination.

■ The duty to warn potential vaccinees of the risks and benefits of receiving the Swine Flu vaccine was assumed by the government under the National Swine Flu Immunization Program of 1976.[5] To determine whether the government has breached its duty to warn plaintiffs of the risks of receiving the Swine Flu vaccine, the laws of the State of Ohio must be applied. Under Ohio law, the tort of lack of informed consent, or failure to warn, is made out when the medical practitioner:

1. Fails to disclose to the patient the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

2. Does not discuss the risks and dangers not disclosed by the medical practitioner that are harmful to the patient;

3. When the unrevealed risks and dangers which should have been disclosed by the medical practitioner actually materialize and are the proximate cause of the injury to the patient; and

4. When the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him prior to the therapy. (citations omitted).

*Siegel, et al. v. Mt. Sinai Hospital of Cleveland, et al.,* 62 Ohio App.2d 12, 21, 403 N.E.2d 202 (1978).

[8] It is not disputed that prior to receiving his Swine Flu vaccination, Mr. Saxe was given a form captioned "Important Information About Swine Influenza (Flu) Vaccine" and a form entitled "Important Information From the U.S. Public Health Service About Swine Flu and Victoria Flu Vaccines." Mr. Saxe signed the former form requesting and consenting to the vaccination. Among other things the form provided:

### SPECIAL PRECAUTIONS

As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.

People with known allergy to eggs should receive the vaccine only under special medical supervision.

People with fever should delay getting the vaccination until the fever is gone.

People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

If you have any questions about flu or flu vaccine, please ask.

The form captioned "Important Information From the U.S. Public Health Service About Swine Flu and Victoria Flu Vac-

---

**5.** The Swine Flu Act provides in pertinent part as follows:

The Secretary is authorized to establish, conduct and support (by grant or contract) needed activities to carry out a national swine flu immunization program until August 1, 1977 (hereinafter in this section referred to as the "swine flu program"). The swine flu program shall be limited to the following:

The development, in consultation with the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, and implementation of a written in-

formed consent form and procedures for assuring the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be administered. Such consultation shall be completed within two weeks after enactment of this Act, or by September 1, 1976, whichever is sooner. Such procedures shall include the information necessary to advise (sic) individuals with respect to their rights and remedies arising out of the administration of such vaccine.

42 U.S.C. § 247b(j)(1)(F).

cines" contained information about influenza vaccinations and advised individuals of their rights or remedies arising out of the administration of the vaccine.

Ohio Revised Code Section 2317.54 provides that written consent to a medical procedure shall be presumed valid when it is acknowledged, signed, and:

> The consent sets forth in general terms the nature of the procedure or procedures, and what the procedures are expected to accomplish, together with reasonably known risks.

When the Swine Flu program was initiated in 1976, there was no substantial evidence as to any causal relationship between the Swine Flu vaccine and neurological disorders. Subsequent studies reported an unexpected high rate of Guillain-Barre Syndrome, but no other illness was reported in higher than statistically expected rates. See: *Daniels v. United States*, C78-X-0987-S (N.D.Alabama, S.Div. Sept. 21, 1981).

Upon consideration of the evidence presented concerning informed consent and the applicable law, this Court finds that neurological disorders, including the disorders suffered by Mr. Saxe, occurred so rarely in the general population that it cannot be called a material risk such that the government owed a duty to inform Mr. Saxe of its possible occurrence. Further, this Court has found that Mr. Saxe's illness was not causally related to his Swine Flu vaccination. Therefore, the government was not obliged to warn Mr. Saxe against the possibility of a neurological disorder.

· In conclusion, this Court finds the consent form, signed by Mr. Saxe, adequately warned Mr. Saxe of the risks inherent in his participation in the Swine Flu program.

## CONCLUSION

Based upon the foregoing, this Court concludes that plaintiffs have failed to sustain their burden of proving that Mr. Saxe's neurological disorder was GBS. Further, this Court finds that plaintiffs have failed to prove, by a preponderance of the evidence, that Mr. Saxe's disorder was caused by the administration of the Swine Flu vaccine. Finally, plaintiffs have failed to establish that the form read and executed by Mr. Saxe was inadequate to warn Mr. Saxe of material risks inherently or potentially involved in participation in the Swine Flu vaccination program.

IT IS SO ORDERED.