837 F.2d 475
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Velma CLAYTON, Executrix of the Estate of Horace W. Clayton,
Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 86-4118.
 United States Court of Appeals, Sixth Circuit.
 Jan. 19, 1988.
 
 Before LIVELY, Chief Judge, NATHANIEL R. JONES, and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff brought an action pursuant to the Federal Tort Claims Act, 28 U.S.C. Secs. 2671-80 (1965), against the United States asserting that the doctors, nurses, and other employees of a Veterans Administration hospital (VA hospital) rendered negligent medical care to plaintiff's decedent. Plaintiff specifically asserts that the hospital's negligence in failing to appropriately treat decedent's low serum phosphorus level, and in permitting decedent's respirator to become temporarily disconnected, was the proximate cause of decedent's death. The district court held that the plaintiff failed to prove by a preponderance of the evidence that defendant's conduct either breached any standard of care to decedent or was the proximate cause of his death. We cannot say that the district court was clearly erroneous in these conclusions and, therefore, affirm.
 
 I.
 
 2
 In 1976, decedent Clayton, who previously suffered a spinal cord injury as a result of an automobile accident, developed the first of numerous urinary tract infections. Thereafter, he was admitted to the VA hospital on numerous occasions for recurrent urinary tract infections and urinary and bowel incontinence. On November 30, 1981, Clayton entered the VA hospital's emergency room with a history of seven days of intermittent fever reaching 102 degrees, chills, decreased appetite, hiccups, and a small healing decubitus of the right hip. At that time, his fluid intake was adequate, consisting mainly of water, coffee, and iced tea. Subsequent tests revealed that Clayton had an electrolyte imbalance caused by low serum levels of sodium (hyponatremia) and potassium (hypokalemia).
 
 
 3
 Upon admission, the VA hospital's staff made efforts to treat Clayton's sodium and potassium imbalance with neutrophase. Tests on December 1 and 2 revealed that his serum phosphorus level was abnormally low. On December 3, Clayton suffered a cardiorespiratory arrest. As a result of his arrest, he was transferred to the medical intensive care unit (MICU) and placed on a respirator to facilitate his breathing. While there was speculation as to the cause of his arrest, Clayton's treating physicians never specifically identified the cause. On December 7, the VA hospital's staff diagnosed Clayton as suffering from hypoxia.[1] As the VA hospital's staff checked Clayton's blood gases, the staff observed that his chest was not expanding properly. They checked the respirator and noted that the expiratory tube had become disconnected. The tube was reconnected immediately and Clayton responded quickly. During the following twelve days, he was gradually weaned from the respirator resulting in his ability to breathe on his own by December 19. On December 31, he was transferred from the MICU to a regular medical ward.
 
 
 4
 Beginning on January 3, 1982, Clayton suffered numerous complications including several episodes of bactermia and high fever. Additionally, he became progressively more acidotic. He received continuous hyperalemination or intravenous feeding and was placed on a respirator because of his inability to breathe properly. Clayton died on March 5, 1982. The autopsy report showed the following pathological diagnoses: necrotizing bronchopneumonia, pulmonary edema, birentricular caridac hypertrophy, arteriosclerosis, and chronic pyelenephritis. The clinical diagnosis included: paraplegia, pneumonia, and candida sepsis.
 
 II.
 
 5
 Plaintiff asserts that the trial court clearly erred in finding that the VA hospital's staff was not negligent and did not breach any standard of care. Fed.R.Civ.P. 52(a) provides that findings of fact should not be reversed unless clearly erroneous. Sawyer v. Arum, 690 F.2d 590 (6th Cir.1982). Conclusions of law, on the other hand, are fairly reviewable by this court. United States v. Mississippi Valley Generating Co., 364 U.S. 520, reh'g denied, 365 U.S. 855 (1961). While it is generally agreed that the determination of causation presents mixed questions of fact and law, this court has held that a trial court's findings regarding both negligence and causation are subject to the clearly erroneous standard. Hasler v. United States, 718 F.2d 202 (6th Cir.1983), cert. denied, 469 U.S. 817 (1984); Downs v. United States, 522 F.2d 990 (6th Cir.1975); Michael v. United States, 338 F.2d 219 (6th Cir.1964). A finding is clearly erroneous only when "the reviewing court on the entire record is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 365, reh'g denied, 333 U.S. 869 (1948). When the findings are based on determinations regarding witnesses' credibility, Rule 52(a) demands even greater deference to a trial court's findings. See Wainwright v. Witt, 469 U.S. 412 (1985).
 
 
 6
 When this court exercises its jurisdiction pursuant to the Federal Torts Claim Act, state law governs the substantive law. 28 U.S.C. Sec. 1346(b) (1976); Richards v. United States, 369 U.S. 1 (1962); Christian v. United States, 184 F.2d 523 (6th Cir.1950). Under Ohio law, the plaintiff bears the burden of proving by a preponderance of the evidence that the defendant was negligent and that the negligence was the proximate cause of the injury. Montanari v. Haworth, 108 Ohio St. 8, 140 N.E. 319 (1923). Moreover, in a medical malpractice suit, the plaintiff must provide not only evidence as to the recognized standard of care in the medical community, but also as to the departure from this standard by a physician in the treatment of the patient. Davis v. Virginian Ry. Co., 361 U.S. 354 (1960). Both proof of the recognized standard applicable to a particular case and whether the physician treating the patient proceeded with the requisite standard of care must be determined from the testimony of medical experts. Jones v. Hawkes Hosp. of Mt. Carmel, 175 Ohio St. 503, 196 N.E.2d 592 (1964); Schultz v. Wallace, 115 Ohio App. 26, 184 N.E.2d 543 (1961).
 
 
 7
 Plaintiff specifically alleges that the hospital's staff departed from the appropriate standard of care on two separate occasions. First, plaintiff avers that Clayton's December 3, 1981, cardiorespiratory arrest was the direct result of the VA hospital staff's failure to diagnose and properly treat his low serum phosphorus level. The district court concluded that the plaintiff failed to prove that the defendant breached any standard of care regarding this incident. The district court reasoned that while there was testimony that the decedent's low serum phosphorus level was not being properly treated, the overwhelming evidence, including the medical records themselves, indicated otherwise. The physicians, who testified on behalf of the plaintiff (Drs. Levine and Weiner), stated that the VA hospital's staff did not adequately treat and monitor Clayton's serum phosphorus level. However, defendant's testifying physicians (Drs. Altose and Tomford) stated that Clayton was administered neutrophase treatment to correct his serum phosphorus imbalance. They further testified that low phosphorus levels were not the cause of Clayton's cardiopulmonary arrest and stated that the VA hospital's care from December 1, 1981, to December 3, 1981, was adequate. A review of the medical record supports Drs. Altose's and Tomford's statements that the VA hospital properly diagnosed and treated Clayton's low serum phosphorus levels. A patient's serum phosphorus level, which normally ranges from 2.5 to 4.5, becomes life threatening when it falls below a level of 1.0. Clayton's serum phosphorus level was 0.9 upon being admitted to the hospital on November 30, 1981. The medical records reflect that through neutrophase treatment his serum phosphorus level climbed to 1.9 on December 1, but fell to 0.9 on December 2. Through supplemental treatment, Clayton's serum phosphorous level measured 1.9, which was above the 1.0 critical level, on December 3, 1981. Viewing the record on this issue, we cannot say that the district court erred in concluding that plaintiff not only failed to prove that defendant breached any standard of care with respect to Clayton's diagnosis and treatment, but also that defendant's treatment caused his cardiorespiratory arrest.
 
 
 8
 Plaintiff also avers that the district court erred in finding that it failed to produce sufficient evidence that defendant breached any standard of care in permitting Clayton's respirator to disconnect on December 7, 1981. The district court concluded that respirators commonly disconnect and that a breach occurs only when the disconnection is not properly noted and corrected. The court held that plaintiff failed to establish either of these factors. On appeal, plaintiff argues that the disconnection was neither properly noted nor timely corrected prior to causing Clayton extended oxygen deprivation and respiratory shock. Plaintiff argues that the respirator, therefore, should have been equipped with an operational alarm system to safeguard against such a disconnection.
 
 
 9
 Defendant's testifying physician, Dr. Altose, stated that while the respirator did, in fact, have a built-in alarm system, the alarm system did not sound because the disconnection occurred at the expiratory valve. While Dr. Altose further testified that he believed the alarm did not sound, as it was not recorded in the medical records, he stated he was unaware whether it was common nursing practice at the hospital to note in the medical records every time the alarm sounded. Such a disconnection, which in his estimation was not itself a breach of any standard of care, could occur for any number of reasons including adjustment of the equipment or bed by hospital personnel or as a result of the patient's own movements. Both a nurse, who cared for Clayton, and plaintiff's testifying physician, Dr. Weiner, corroborated Dr. Altose's testimony in stating that Clayton himself may have disconnected the respirator. Upon properly noting in Clayton's medical history record that the respirator tube had become disconnected, the hospital's staff reconnected the tube. While plaintiff asserts that the disconnection lasted at least twelve minutes, both plaintiff's and defendant's testifying physicians stated that Clayton was deprived of oxygen for only one to three minutes. Based upon a review of the record, we cannot say that the district court erred in concluding that the plaintiff failed to establish that the disconnection was not properly noted and corrected.
 
 III.
 
 10
 Plaintiff next asserts that the district court erred in finding that it failed to establish by a preponderance of the evidence that the VA hospital's conduct was not the proximate cause of Clayton's death. Specifically, plaintiff asserts that the respirator's temporary disconnection caused permanent diaphragm muscle fatigue, thereby making Clayton susceptible to the infections that caused his death. The district court found that the plaintiff failed to establish that the temporary disconnection more probably caused Clayton's death than any other causes. It is well settled that, in addition to establishing a duty and a breach of that duty, plaintiff also must establish, by a preponderance of the evidence, that any such breach caused the patient's injuries. Saxe v. United States, 577 F.Supp. 135 (N.D. Ohio 1983), aff'd, 751 F.2d 386 (6th Cir.1984); Menifee v. Ohio Welding Prod., 15 Ohio St.3d 75, 472 N.E.2d 707 (1984); Ohio Fair Plan Underwriting Ass'n v. Arcara, 65 Ohio App.2d 169, 417 N.E.2d 115 (1979). The fact that some other cause concurred with defendant's negligence in producing the injury nonetheless relieves the defendant from liability where it is shown the other cause would have produced the injury independently of defendant's negligence. Garbe v. Halloran, 150 Ohio St. 476, 83 N.E.2d 217 (1948). At a minimum, plaintiff must provide the trier of fact with evidence that the injury was more likely than not caused by defendant's negligence. Shumaker v. Oliver B. Cannon & Sons, 28 Ohio St.3d 367, 504 N.E.2d 44 (1986).
 
 
 11
 In reaching its conclusion that the respirator's temporary disconnection was not the proximate cause of Clayton's death, the district court relied upon the testimony of testifying physicians. Plaintiff's testifying physician, Dr. Weiner, stated that while the respirator's temporary disconnection significantly contributed to the diaphragm muscle fatigue, it was not the only cause of Clayton's death but, rather, only one of the contributing causes. Dr. Weiner further testified that Clayton's prolonged dependence upon the respirator prior to the temporary disconnection was a significant factor in the decedent's pulmonary infections. Plaintiff's other testifying physician, Dr. Levine, stated that the respirator's temporary disconnection led to the infections causing Clayton's death. However, on cross-examination, Levine acknowledged that Clayton suffered from infections prior to the disconnection and could not state with reasonable medical certainty that had the dissconnection not occurred Clayton would not have suffered from infection. Defendant's testifying physicians, Drs. Altose and Tomford, stated that Clayton suffered from infection and fever upon being admitted to the hospital on November 30, 1981. Both doctors further testified that within twenty-four hours of the disconnection, Clayton's respiratory condition was stabilized. By December 19, 1981, Clayton was able to breathe on his own and was free from any infections. Dr. Tomford opined that Clayton's recurrent lung, urinary tract, and blood stream infections from January through March were not unusual for severely ill patients who suffered prior spinal cord injuries. Upon considering the record of all four physicians' testimony on the issue of causation, we cannot say that the district court erred in concluding that the plaintiff failed to establish by a preponderance of the evidence that the respirator's disconnection was the proximate cause of Clayton's death.
 
 
 12
 For the foregoing reasons, we AFFIRM the district court's holding.
 
 
 
 [1]
 Hypoxia is defined as a reduction of oxygen-carrying capacity of the blood as a result of a decrease in the total hemoglobin or an alteration of the hemoglobin constituents