Virginia BENEDICT, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendants.

No. C78–0529.

United States District Court,
N.D. Ohio, E.D.

April 2, 1986.

Robert A. Marcis, Spangenberg, Shibley, Traci & Lancione, Cleveland, Ohio, for plaintiffs.

Patrick M. McLaughlin, U.S. Atty., Arthur I. Harris, Asst. U.S. Atty., Cleveland, Ohio, for defendants.

## MEMORANDUM OF OPINION AND DECISION

BATCHELDER, District Judge.

This cause came on for trial to the Court sitting without a jury, on the complaint of Virginia and Leonard Benedict against the United States, seeking damages for injuries suffered as a result of Virginia Benedict's inoculation for swine flu. This case is one of the many "swine flu" cases filed throughout the country following the mass immunization program undertaken by the United States government in 1976. In this particular case, the government has conceded that the plaintiff contracted Guillain-Barre Syndrome (hereinafter GBS), and thus, by the terms of the pretrial order of Judge Gerhard Gesell, the plaintiff need not prove any particular theory of liability, but must prove that the swine flu inoculate which she received was causally related to her GBS.

■ The expert testimony and medical literature, and indeed, the parties, are in agreement that medicine has not yet developed any test capable of determining the cause of GBS in any given patient. Thus, to prevail in this case, the plaintiff must prove by a preponderance of the evidence that her swine flu inoculation was the most likely cause of her subsequent GBS. Because the plaintiff has failed to sustain her burden of proof, the Court finds that judgment must be rendered against the plaintiffs and in favor of the defendant, the United States of America, and makes the following findings of fact and conclusions of law in support of this judgment.

### FINDINGS OF FACT

A. FACTS SURROUNDING THE SWINE FLU INOCULATION AND THE ONSET OF PLAINTIFF'S GBS.

Although there are numerous discrepancies and inconsistencies between Mrs. Benedict's testimony at trial and her deposition, which was taken some five and one-half years prior to the trial and considerably closer in time to the inoculation and her ensuing problems, I find that the deposition testimony is more consistent with the medical and hospital records and histories than is the trial testimony. Further, while I am convinced that both plaintiffs and their daughter, Debbie Stahurski, who also testified at trial, have in their trial testimony endeavored to relate the events subsequent to the inoculation and leading to the onset of Mrs. Benedict's GBS as accurately as they are able, I am likewise convinced that their memories of these events have inevitably been colored by their having undergone the horror of GBS, either as its victim or the family members of the victim, and having then lived with the stress of the subsequent litigation for over seven years. Accordingly, after reviewing the trial testimony, the depositions filed in this case and the hospital and medical records, I find the facts surrounding the inoculation and the subsequent onset of GBS to be as follows.

Virginia and Leonard Benedict each received a swine flu inoculation on November 5, 1976. Although Leonard Benedict suffered no ill effects from the shot, Virginia Benedict felt fatigued and not well for approximately two days after receiving the shot, and then felt better, until approximately two weeks following the inoculation. At that time she began to experience a "flu like" illness, with general achiness of her muscles. Mrs. Benedict continued to feel ill to some degree throughout the remainder of November and December, but did not seek any medical assistance until December 29, 1976. On that date, she visited her family physician, Dr. Leonard Magpoc, for treatment of a cough from which she had been suffering for an indeterminate period of time.

Doctor Magpoc noted on his office records that Mrs. Benedict's cough was "productive" and prescribed a course of treatment consisting of tetracycline and an expectorant. It is significant to note that Dr. Magpoc's records and deposition testimony indicate that the December 29th office visit was due solely to the upper respiratory infection, and that the Doctor conducted no neurological examination of Mrs. Benedict because she did not complain of any symptoms which indicated the need for any such examination.

Mrs. Benedict's upper respiratory infection improved after the visit to Dr. Magpoc, and he had no further contact with her until she was admitted to Southwest General Hospital on January 13, 1977, complaining of severe pain in the lower back and the nape of the neck, and difficulty in walking. Doctor Magpoc's deposition testimony indicates that upon admission to the hospital Mrs. Benedict's problems in walking were due to the pain, rather than weakness, and that her reflexes at the time of admission to the hospital were normal. The medical history taken shortly after her admission to the hospital reflects that Mrs. Benedict began experiencing pain on January 11, 1977 after lifting her granddaughter.

The Southwest General Hospital records note that by January 16, 1977, the third hospital day, Mrs. Benedict was complaining of weakness in both legs as well as the pain, and by January 17, 1977, she was becoming uncoordinated and experiencing difficulty in movement, and was unable to move her legs. At this point, Dr. Magpoc called in Doctor John Bryk, a neurosurgeon, as a consulting physician, who diagnosed Mrs. Benedict's condition as GBS, noting that she had a four day history of ascending paralysis, and that at the time of his examination of her on January 17, she had no reflexes in her ankles and knees.

Mrs. Benedict was transferred on January 17, 1977, to Cleveland Metropolitan General Hospital where she remained for over one month, during which time her condition deteriorated to a paralysis of all four extremities as well as her facial muscles, and she required the assistance of a respirator to breathe. The Metro General Hospital records of January 18, 1977, reflect that she had been suffering from weakness for five days with accompanying tingling of hands and feet. Those records further reflect that the patient herself furnished considerable history to the Doctor, specifying that she first had noticed low back pain sometime after picking up her "niece." She also advised that she had been suffering from the "flu" for some six weeks, with a cough which was so severe that she experienced occasional incontinence, but that the cough had recently improved.

After a long and arduous ordeal including extensive physical therapy, Mrs. Benedict recovered from the illness, to the point where she is generally able to walk without the assistance of a cane and can again drive a car.

## B. CAUSATION.

The factual issue which is pivotal to a resolution of this case is whether Virginia Benedict's GBS was causally related to the swine flu inoculation. Because the parties are in agreement that the actual cause of GBS cannot be determined with medical certainty in any given case, it is necessary to determine first, how the most likely cause of any given case of GBS may be identified, and then whether the most likely cause of *this case* of GBS was the preceding swine flu inoculation. After careful review of the testimony of all of the expert witnesses and the documents admitted into evidence in this matter, I find as follows.

■ It is clear that in the absence of any medical or biological tests to ascertain the specific cause of GBS, its cause in a specific case cannot be established without relying on epidemiological data. This opinion was expressed and substantiated by all three of the government's expert witnesses, two of whom are unquestionably among the world's leading authorities on GBS.[1] The epidemiologic data available relative to the incidence of GBS among members of the general population as compared to its incidence among members of the population who have received the swine flu inoculations consists in the main of studies published in medical and scientific journals; these studies have been introduced into evi-

1. Doctor Maurice Victor, co-author of one of the standard medical textbooks on neurology and a member of the special panel commissioned by the Justice Department, which undertook the study of the relationship between the swine flu inoculations and GBS, testified at trial in response to the question as to whether a clinician could establish the cause of GBS in any patient without relying on epidemiology, that

"... my opinion is that one cannot use the temporal association of events in an individual patient to pass judgment on causal relationships." (Transcript for January 7 and 8, page 30, lines 3 through 5).

"... it is only when those kind of studies [epidemiological] are conducted that fortuitous temporal associationships can be proved or disproved to have a causal relationship." (Transcript for January 7 and 8, page 31, lines 15 through 18).

Similarly, Doctor Neal Nathanson, professor of epidemiology for twenty-two (22) years at John Hopkins University, and also on the special panel, testified at trial that in his opinion, based on a reasonable epidemiological certainty, a clinician cannot establish the cause of GBS in any patient without relying on epidemiology. (Transcript for January 7 and 8, page 102, lines 15 through 21).

dence in this case.[2] The testimony relative to these studies clearly indicates that, although they are not without flaws, they are nonetheless reliable. Each of these studies upon which the government's experts rely is peer reviewed; as of this writing, there appear to be no published studies contradicting their data or conclusions, and none were introduced at trial; the problems which do exist with these studies were explained cogently and satisfactorily by the government's experts at trial; and plaintiff's attacks on these studies were wholly unsupported by any hard data.

I am satisfied that the expert testimony and the epidemiological data presented have established that there was a period of increased risk to an individual of contracting GBS following a swine flu inoculation, compared to his risk of contracting the disease if he remained unvaccinated, and that that period lasted for a maximum of eight weeks from the date of inoculation. The data establishes that after the expiration of that eight week period, a vaccinated individual was at no greater risk of contracting GBS than was any member of the general population; i.e. after the expiration of eight weeks there is no data with which

to prove a contention that the swine flu inoculation was a likely cause of an individual's GBS.

The data also establishes that the two clinically essential criteria for diagnosis of GBS are progressive motor weakness of more than one limb, usually symmetrical, and loss of deep tendon reflexes. Furthermore, the studies of GBS establish that among the events universally accepted as triggering GBS, upper respiratory infections occurring approximately two weeks prior to onset are the most common.

■ To apply the foregoing to Virginia Benedict, it is first necessary to determine the date of onset of her GBS. Although Mrs. Benedict's expert witness, Doctor Foley, testified that he believes that the onset of the disease may have been as early as January 10, 1977, I find that the medical evidence establishes that the loss of deep tendon reflex is an essential element of the disease itself,[3] and the medical records of Mrs. Benedict establish that as of January 13, 1977, these deep tendon reflexes were still present. Thus, the onset of the disease occurred no earlier than January 13, which was at least sixty-nine days after Mrs. Benedict received her swine flu inocu-

2. The following articles and studies were introduced into evidence by the defendant:

(1) Natl. Inst. Neurol. Cent. Disease Control, *Criteria for Diagnosis of GBS*, 3 Ann.Neurol.App. 4 (1978).

(2) Arnason, *Inflammatory Polyradiculoneuropathies*, Peripheral Neuropathy, 1110–1148 (1975).

(3) Arnason, *Acute Inflammatory Demyelinating Polyradiculoneuropathies*, Peripheral Neuropathy 2050–2100 (1984).

(4) Retailliau, Curtis, Storr, Caesar, Eddins, and Hattwick, *Illness after Influenza Vaccination Reported Through a Nationwide Surveillance System, 1976–77*, III Amer.J. Epidemiology 270 (1980).

(5) Schonberger, Bregman, Sullivan-Bolyai, Keenlyside, Ziegler, Retailliau, Eddins and Bryan, *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–77*, 110 Amer.J. Epidemiology 105 (1979).

(6) Marks and Halpin, *Guillain-Barre Syndrome in Recipients of A/New Jersey Influenza Vaccine*, 243 J.A.M.A. 2490 (1980).

(7) Breman and Hayner, *Guillain-Barre Syndrome and its Relationship to Swine Influenza*

*Vaccination in Michigan, 1976–1977,* 119 Amer.J. Epidemiology 880 (1984).

(8) Langmuir, Bregman, Kurland, Nathanson and Victor, *An Epidemiologic and Clinical Evaluation of Guillain-Barre Syndrome Reported in Association with the Administration of Swine Influenza Vaccines,* 119 Amer.J. Epidemiology 841 (1984).

(9) Greenstreet, *Estimation of the Probability that Guillain-Barre Syndrome was Caused by the Swine Flu Vaccine: US Experience (1976–77),* 24 Med.Sci.Law 61 (1984).

(10) Melnick and Flewett, *Role of Infection in the Guillain-Barre Syndrome,* 27 J.Neurol., Neurosurgery, Psychiatry 395 (1964).

(11) Kennedy, Danielson, Mulder and Kurland, *A 42 Year Epidemiologic and Clinical Study,* 53 Mayo Clin.Proc. 93 (1978).

(12) Schonberger, Hurwitz, Katona, Holman and Bregman, *Guillain-Barre Syndrome: Its Epidemiology and Associations with Influenza Vaccination,* 9 Ann.Neurol. 31 (Supp.1981).

3. See the trial testimony of Doctor Victor, transcript for January 7th and 8th, page 21, line 16, through page 22, line 11.

lation, or nine full weeks and six days later. Accordingly, since the onset of Mrs. Benedict's GBS occurred at least thirteen days after the latest day which could be included in the period of increased risk,[4] I find that the swine flu inoculation was not proven by a preponderance of the evidence to have been the likely cause of Mrs. Benedict's contracting GBS.

Mrs. Benedict's expert witness, Dr. Foley, has testified that the concatenation of three significant events leads him to conclude, regardless of the epidemiological data, that Mrs. Benedict's GBS was causally related to the swine flu inoculation. He hypothesizes that the swine flu inoculation, considered together with the flu-like illness from which Mrs. Benedict suffered for some period of time subsequent to the inoculation, and the subsequent GBS, have a temporal relationship so strongly suggestive of a causative relationship, that to assume some cause of the GBS other than the inoculation would be, in his words, "gratuitous." Doctor Foley also testified that in his opinion, the causative factor of GBS in *this case* could be determined without reference to the epidemiological data, and that, although he had no hard data to substantiate his belief, he felt that the flu-like illness was an allergic reaction to the inoculation which eventually culminated in the full-blown GBS. Tempting as it might be to draw Doctor Foley's conclusions out of sympathy and concern for Mrs. Benedict's indisputably traumatic ordeal, there is not one single piece of data in the record to support Doctor Foley's suppositions; Doctor Foley admitted in his video-tape deposition testimony that he had no data and that there were no published studies to support his suppositions; indeed, those suppositions were effectively refuted by the government's experts.

The issue in this case is not whether the swine flu inoculation can be definitively ruled out as a cause of Virginia Benedict's GBS. Neither is the issue whether there is a more likely cause of her GBS, although I find that the government has established through its experts, the epidemiological data and the medical records of Mrs. Benedict, that the most likely cause of her GBS was the upper respiratory infection from which she suffered for some period of time subsequent to the date of her swine flu inoculation, and for which she was treated by Doctor Magpoc on December 29, 1976, some two to three weeks prior to the onset of the GBS. Rather, the issue here is whether the swine flu inoculation which Mrs. Benedict received on November 5, 1976, has been shown by a preponderance of the evidence to be the likely cause of the GBS which Mrs. Benedict contracted on or about January 13, 1977. I find that the evidence does not demonstrate that the swine flu inoculation was a causative factor in Mrs. Benedict's subsequent GBS.

### CONCLUSIONS OF LAW

1. This action is brought pursuant to 28 U.S.C. § 1346(b) and 42 U.S.C. § 247b, was consolidated in 1978 with the numerous other "swine flu" cases for coordinated pre-trial procedures in the United States District Court for the District of Columbia, Judge Gerhard Gesell presiding, and was remanded in 1979 to this Court for further proceedings.

2. Pursuant to 42 U.S.C. § 247b(k)(2)(A), the defendant, the United States is liable to the plaintiffs only "... for personal injury arising out of the administration of swine flu vaccine under the swine flu program and based upon the act or admission of a program participant in the same manner and to the same extent as the United States would be liable in any other action brought against it under such section [28 U.S.C. § 1346(b)] ..."

3. Pursuant to the Final Pre-trial Order of Judge Gesell, the United States in this case having stipulated that plaintiff Virginia Benedict did in fact develop GBS, plaintiffs are not required to prove any specific

---

**4.** See trial testimony of Doctor Neal Nathanson, transcript for January 7 and 8, page 116, lines 14 through 21.

**128**

theory of liability, but must prove that plaintiff's GBS was caused by the administration of the swine flu vaccine.

4. The plaintiffs' burden of proof in this action is to prove by a preponderance of the evidence that the GBS contracted by plaintiff Virginia Benedict in January, 1977, was directly and proximately caused by the swine flu innoculation administered to her on November 5, 1976, pursuant to the federal swine flu program. *Saxe v. United States*, 577 F.Supp. 135, 144, 577 F.Supp. 135 (N.D.Ohio 1983), *aff'd*, 751 F.2d 386 (6th Cir.1984); *Varga v. United States*, 566 F.Supp. 987, 1012 (N.D.Ohio 1983).

5. Neither a mere temporal relationship between the administration of the swine flu vaccine and the onset of GBS, without more, nor mere conjecture will support a finding of causation. *Hasler v. United States*, 718 F.2d 202 (6th Cir.1983).

6. The record in this case clearly demonstrates that plaintiffs have failed to establish by a preponderance of the evidence that the swine flu inoculation directly and proximately caused plaintiff Virginia Benedict's GBS. Plaintiffs have presented no medical evidence to support their theory of causation, but have relied solely on the temporal relationship between the two events, and the conjecture of plaintiffs' expert that because of this relationship it would be "gratuitous" to assume a cause for the GBS other than the vaccine. The medical evidence, however, is entirely to the contrary.

7. Plaintiffs having failed to meet their burden of proof, judgment must be entered in favor of the United States.